WESTERN CREDIT COMPANY, INC., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82457. Filed September 28, 1962.

*Randall Swanberg, Esq.*, for the petitioner.
*Joseph D. Holmes, Jr., Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined that there is due from petitioner deficiencies in personal holding company surtax and in income tax for the periods and in the amounts following:

| Year | Tax | Amount |
|---|---|---|
| 1949 | Personal holding company | $3,596.07 |
| 1950 | Personal holding company | 3,501.65 |
| 1951 | Personal holding company | 5,305.84 |
| 1952 | Personal holding company | 4,348.27 |
| 1953 | Personal holding company | 4,872.27 |
| 1954 | Income [1] | 5,133.69 |
| Jan. 1—Apr. 30, 1955 | Income [1] | 1,400.87 |
| May 1—Apr. 30, 1956 | Income [1] | 3,855.70 |

[1] The personal holding company surtax was computed as part of the income tax for these periods.

The only issue for decision is whether petitioner is liable for tax as a personal holding company.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation, incorporated in 1948 under the laws of Montana, with its principal place of business in Great Falls, Montana.

It filed Federal income tax returns for the calendar years 1949 through 1954, for the tax period January 1 through April 30, 1955, and for the taxable year ended April 30, 1956, with the collector or district director of internal revenue, Helena, Montana. Petitioner did not file personal holding company returns for any of the above tax periods.

During each of the tax periods here involved, more than 50 percent in value of the outstanding stock of petitioner was owned by five or fewer individuals.

Petitioner, during the periods in controversy, was engaged in the business of making small loans to individuals. The State of Montana had no statutes specifically relating to small loan, personal finance, or mortgage loan companies. Petitioner was operated under the general corporation statutes of the State of Montana. All of petitioner's gross income, except a small amount of rentals, was derived from borrowers in the operation of this business.

When a potential borrower came into petitioner's office, he was interviewed by petitioner's manager who determined whether an application for a loan was warranted. Many persons were refused loans on the basis of the manager's interviews, and applications were not taken from them. If the person submitted an application, the manager prepared a work or scratch sheet as he explained the details of the loan to the borrower. This worksheet, containing figures written by the manager, showed the amount of the loan together with the calculation and amount of charges, and became a part of petitioner's records and files.

One of the charges computed on the sheet when the loan was made was termed a "contract charge" and was equal to $10 if the principal amount of a loan was $100 or less, and was $15 or 3 percent of loan principal, whichever was greater, for a loan in a principal amount exceeding $100.

Another of the charges computed on the sheet was a "carrying charge" equal to 1 percent per month of the principal sum, calculated in advance, for the duration of the loan when a loan was for $100 or more, or $1.67 per month when the principal of the loan was under $100. This charge was computed separately from the contract charge.

Petitioner's manager also computed additional charges on the worksheet, consisting of filing or recording fees regarding chattel mortgages securing the loan, insurance premiums for life insurance on the borrower's life, and premiums for insurance covering an automobile, if the loan was to be secured by a chattel mortgage on a car.

If the loan application was accepted, the borrower executed a promissory note in a face amount equal to the total of the amount of the loan, the carrying charge, the contract charge, and any other charges or fees collected, which note was payable in equal monthly installments over a stated period. No breakdown of the face amount ap-

peared on the note, and it provided only. for interest at the rate of 8 percent per annum after maturity until paid.

Petitioner's manager, in detailing a loan for a borrower, always explained that the amount of the contract charge would be "used up" in processing the application for the loan. If the borrower made payment of his loan before the installments were due, he received a rebate for a proportionate part of the carrying charge, but he received no rebate of any part of the contract charge.

Petitioner investigated the credit of every borrower and always checked the identity, value, and title of the property which was to serve as collateral for the loan. Petitioner accepted as collateral various types of tangible personalty, such as automobiles, furniture, equipment, and livestock. If the collateral was furniture, petitioner's manager often went to the borrower's home to check the furniture as well as the living standard of the borrower. If the collateral was equipment or livestock, a trip to the borrower's place of business or farm was required. Often the collateral was an automobile which the borrower wanted to buy with the proceeds of the loan. Petitioner's manager checked the motor and serial numbers of the car itself. This often necessitated a trip to the lot where the car was being sold. Petitioner subscribed to a service which published current used-car prices, and petitioner's manager used this service, together with information obtained from the seller and from personal inspection of the car, to arrive at loan value. Petitioner also subscribed to a service which published the automobile registration and title laws of each State, and this service was used to check title of cars licensed out of State. In order to obtain title and license for an automobile in Montana, it was necessary to pay property tax on the vehicle. Petitioner's manager handled the payment of taxes and fees, and the claiming of tax credits on out-of-State cars, and the obtaining of licenses and titles in order that petitioner's chattel mortgage on the car would be in order. The manager took powers of attorney from borrowers in order to make application for title.

The credit investigation of a borrower generally started with a check with the local credit bureau of which petitioner was a member. Petitioner's manager could often find from the bureau the borrower's creditors, after which he would spot check with some of the creditors to find out if the information given him by the borrower had been correct and to discover the borrower's paying habits. Sometimes the bureau had no record for the borrower. This was usually the case if the borrower was from out of town or if he had recently moved to Great Falls. In such case, petitioner's manager had to telephone or otherwise contact whatever creditors the borrower had given as references or the credit bureau in the borrower's home city, or refer the matter to the local credit bureau for forwarding to the out-of-town

bureau. In either case, petitioner incurred toll charges for the telephone calls or an additional charge by the local credit bureau, which charged petitioner amounts based on the work involved in handling an inquiry.

In case of a consolidation loan, petitioner paid the borrower's creditors directly, in many instances by delivering checks to them in discharge of the borrower's debts. Petitioner in such cases obtained releases of security instruments such as chattel mortgages. Often these releases were prepared by petitioner.

Sometimes, petitioner performed services for customers by taking wage assignments from them, collecting portions of their incomes, and discharging their debts from the collected wages.

Except for the contract charge and the carrying charge, petitioner did not charge borrowers for the foregoing services. The contract charge was intended to defray petitioner's expenses incurred in performing those services, although there was no direct relation between the amount of the contract charge and the cost of performing services in connection with any particular loan.

Receipts from borrowers were applied first to principal, until principal was paid in full, after which the receipts were entered on petitioner's records under the following categories:

1. Collected fees.
2. Bad debt recovery (including principal of the bad debt).
3. Extra interest collections (used on extensions of loans).
4. Insurance premium income.
5. Miscellaneous income (recording fees, notary fees, etc.).
6. Overages.

The account entitled "collected fees" included receipts from both the contract charge and the carrying charge. Petitioner reported gross income in the foregoing categories during the periods under review.[1]

In each of the tax periods involved, the total sum of the contract charges exceeded 20 percent of petitioner's gross income.

The expenses petitioner incurred in the operation of its business were covered by all the income received. Neither the contract charge, the carrying charge, nor any other charge was specifically allocated on any of petitioner's books and records to any particular expense of the business. The expenses incurred by petitioner in the operation of its business were itemized on its tax returns and include salaries, interest, advertising, rent, filing fees, rebates, bad debts, and other expenses normally incurred in the operation of a business.

---

[1] On the returns the amounts in these categories were shown as gross income under the general heading "revenue," and it was not indicated nor is it contended that the amounts collected by petitioner for specific charges, incurred by petitioner in the capacity of an agent, did not constitute gross income.

On the death of Frank M. Wallace, one of the original incorporators of petitioner, in 1951, his stock in petitioner descended to his widow and two children, from whom the present owners of the corporation purchased the stock on July 28, 1954, under a contract the terms of which limit the right of the corporation to declare dividends.

Respondent determined that at least 80 percent of petitioner's gross income for each tax period involved was derived from interest and its stock was owned by not more than five individuals so that petitioner was subject to the personal holding company surtax.

ULTIMATE FINDING.

Petitioner has failed to show that more than 20 percent of its gross income in any of the tax periods involved was other than personal holding company income.

OPINION.

The only issue is whether petitioner's gross income from contract charges constitutes "interest" within the meaning of section 543(a)(1) of the 1954 Code,[2] and its predecessor section 502(a) of the 1939 Code, thereby qualifying as "personal holding company income." The parties have stipulated that petitioner's gross income from contract charges exceeded 20 percent of petitioner's gross income in each of the tax periods involved, so if this income is not interest, less than 80 percent of petitioner's gross income will qualify as personal holding company income and petitioner will not be liable for the surtax.[3] On the other hand if the income from contract charges is interest, the parties agree petitioner was a personal holding company.[4]

This question was before the courts in several cases in the late 1930's and the early 1940's, but unfortunately the sequence of the decided

---

[2] SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of:

(1) DIVIDENDS, ETC.—Dividends, interest, royalties (other than mineral, oil, or gas royalties), and annuities. * * *

[3] SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

(1) GROSS INCOME REQUIREMENT.—At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *

[4] Petitioner admits it cannot prove that the "carrying charges" were not interest. The petition raised issues of whether petitioner was exempt from classification as a personal holding company because there were contractual limitations on petitioner's right to declare dividends, because petitioner was not incorporated with the intent to avoid income tax to its shareholders, and because petitioner was a personal finance or loan company exempt under section 542. These contentions have been abandoned, except petitioner makes passing reference on brief to the lack of intent to avoid tax on its shareholders. No specific explanation is given why petitioner is not exempt under section 542 except such as can be gleaned from the evidence.

cases, and the lack of any recent cases on the point, leaves the answer somewhat uncertain.

The statute does not define interest. The Supreme Court has defined interest as the "amount which one has contracted to pay for the use of borrowed money," *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552 (1932), and as "compensation for the use or forebearance of money," *Deputy* v. *du Pont*, 308 U.S. 488 (1940), and in both cases assumed that Congress used the word in the tax statute in its ordinary sense. Section 1.543–1(b) (2), Income Tax Regs., continuing a provision of prior regulations,[5] states merely that interest "means any amounts, includible in gross income, received for the use of money loaned."

In *Noteman* v. *Welch*, 108 F. 2d 206 (1939), the Court of Appeals for the First Circuit held that a 3-percent-per-month flat charge made by a small loan company, covering interest as well as other charges as allowed by Massachusetts law, was all interest for personal holding company tax purposes. The court pointed out that, despite testimony to the effect that 1 percent was considered a reasonable profit to the lender and 2 percent would roughly cover the whole operating expenses of the lender, the charge was a blanket charge made against all borrowers, whether services were rendered or not, and that to a large extent the services which the charge was supposed to cover were rendered, not to the borrower, but to the lender itself, in deciding whether to make the loan, and in safeguarding the loan after it was made. The court also noted that "Judging from the description of the taxpayer's business in the record it seems that the only real consideration which the ordinary small borrower receives is the use of the money, and certainly, from his point of view, that is what he pays for." The court concluded that petitioner had not proven that more than 20 percent of its gross income, which all came from the borrowers, was for something other than interest, so the taxpayer was a personal holding company.

Soon after the *Noteman* case was decided the Board of Tax Appeals in *Seaboard Small Loan Corporation*, 42 B.T.A. 715 (1940), and in several unpublished Memorandum Opinions, held that fees charged by small loan companies ostensibly for investigating, closing, and servicing loans were interest. These cases were decided on the authority of *Noteman* without further discussion. Next the Third Circuit in *Girard Inv. Co.* v. *Commissioner*, 122 F. 2d 843 (1941), reversing an unpublished opinion of the Board of Tax Appeals on another point, noting that this was the second attempt (*Noteman* being the first) of small loan companies to avoid application of the personal holding company tax, again held that the charges made to cover the high costs of the small loan business were interest. The court appears to have concluded that the word "interest" as used

---

[5] Sec. 39.502–1(b), Regs. 118.

in the personal holding company statute was intended to include not only "pure" interest but "nominal" interest as well which would include amounts charged to cover the increased costs of the "effort of administration" and the "insecurity of payment" in the small loan business.

Shortly thereafter the Board of Tax Appeals, in *Seaboard Loan & Savings Association, Inc.*, 45 B.T.A. 510 (1941), again held that "investigation" fees of 2 percent charged on each loan, although separately stated to the borrower and segregated on taxpayer's books, were in fact interest under the personal holding company law. The Court relied on *Noteman, Seaboard Small Loan*, and *Girard Inv. Co.* and said that all questions raised in the instant case were raised in *Noteman* and decided against taxpayer, and noted that substantially all the services charged for were for the benefit of the lender, not the borrower, and the only consideration received for the amounts paid by the borrower was the money loaned. Also in 1941 the Board held in *R. Simpson & Co.*, 44 B.T.A. 498 (1941), affirmed per curiam 128 F. 2d 742 (C.A. 2, 1942), certiorari dismissed 321 U.S. 225 (1944), that interest charged by a pawnbroker was interest under the personal holding company law, saying that every argument advanced by taxpayer was considered unfavorably in *Noteman* and that efforts to distinguish *Noteman* because of the difference in operation of the two businesses were unavailing because they failed to impeach the underlying principle. The Court of Appeals affirmed per curiam on the authority of *Noteman*.

In 1943 the Tax Court, in several unpublished opinions, relying entirely on the above cases, also held that statutory investigation fees charged by small loan companies constituted interest.

Also in 1943, in *Workingmen's Loan Ass'n* v. *United States*, 49 F. Supp. 25 (D. Mass. 1943), the same district judge who had decided the *Noteman* case again held that fees charged by a small loan company under authority of the same Massachusetts statute for "investigation, indentification, inspection and appraisal," and charged to all borrowers without agreement for some actual service to be rendered to the borrowers, were interest. The court felt there was no essential difference between the facts there involved and the facts in *Noteman*. However, by decision rendered April 18, 1944, *Workingmen's Loan Ass'n* v. *United States*, 142 F. 2d 359 (1944), the First Circuit reversed the District Court and held that the charges involved in that case were not interest under the personal holding company law. The opinion, written by the same judge who wrote the opinion in *Noteman*, found that the facts in the present record were significantly different from the facts in *Noteman* so that the latter case was not controlling. It pointed out that its holding in *Noteman* was on the basis that it was impossible from the record to allocate any definite portion of

the charges to services rendered to borrowers which were properly separable from interest, and that taxpayer had failed to sustain its burden of proving that over 20 percent of its gross income was derived from sources other than interest. However, the court said it had recognized in *Noteman* that charges made by lenders in connection with making loans are not necessarily all interest and a loan contract may properly call for rendition of specified services by the lender, for which the lender makes a separate charge in addition to interest, for which the borrower would otherwise have to pay a third person.

The opinion went on to point out that in the instant case the taxpayer had the practice of separating what it regards as the interest charges from charges for services to borrowers in investigating, identifying, inspecting, and appraising the credit and security of the borrower; that this "initial charge" is made known to the borrower before the loan is consummated and is collected in advance as a flat sum which does not vary with the duration of the loan, it is adjusted to the amount and type of loan, is a customary and usual charge made by concerns engaged in the small loan business, and is specifically allocated, by agreement with the borrower, to the expense of "investigation, identification, inspection and appraisal." The only factual distinction from the *Noteman* case specifically mentioned in the opinion was that in *Noteman* "the blanket charge for 'expenses' was fixed at 2% a month on the unpaid balances and ran along during the whole life of the loan." "In view of the stipulated facts," the court held for the taxpayer.

With *Noteman* thus seemingly undermined, the Court of Appeals for the Eighth Circuit, affirming a Memorandum Opinion of this Court in *Bond Auto Loan Corp.* v. *Commissioner*, 153 F. 2d 50 (1946), held that a $20 "extra hazard" flat charge authorized to be made by automobile loan companies by State law was interest under the personal holding company tax statutes, relying on the *Noteman* case for support. The opinion simply noted that *Workingmen's Loan Ass'n* had held that the initial charges there involved were not interest, but made no effort to distinguish the two cases.

We find no published opinions dealing with the question of whether service charges made by small loan companies qualify as interest under the personal holding company laws since *Bond Auto Loan Corp.* v. *Commissioner*, *supra*. This is in all likelihood due to the fact that since 1938 the personal holding company sections of the internal revenue laws have contained provisions exempting regulated small loan companies from personal holding company status if 80 percent of their gross income is "lawful interest" received from loans made to individuals, and they meet the other requirements of the law.[6]

---

[6] See sec. 542, I.R.C. 1954, and predecessor section of the 1939 Code.

However, this Court in *General American Life Ins. Co.*, 25 T.C. 1265 (1956), did cite *Bond Auto Loan Corp.* v. *Commissioner* and *Seaboard Loan & Savings Association, Inc.*, both *supra*, as support for holding that penalty charges collected for prepayment of mortgages constitute interest income to the mortgagee, saying that regardless of the nomenclature used, "the common denominator present throughout is that the charges were, in fact, a part of the cost to the borrowers for the use of the lenders' money," and, if so, it is interest.

To complete the résumé, the Commissioner of Internal Revenue, in Rev. Rul. 57-540, 1957-2 C.B. 318, ruled that finance or service charges imposed on borrowers by a finance company, which do not warrant a charge separate from that for use of borrowed money, constitute interest under the personal holding company law, relying on *Noteman* and comparing *Workingmen's*. However, in Rev. Rul. 57-541, 1957-2 C.B. 319, the Commissioner distinguished *Noteman* and cited *Workingmen's* in ruling that charges made by a finance company as financing fees for servicing FHA and VA loans do not constitute personal holding company income.

Were it not for *Workingmen's Loan Ass'n* v. *United States, supra*, we would have little difficulty in holding, on the clear weight of authority, that the charges here involved are interest under the personal holding company law. However, since the charges here involved are in some respects similar to those involved in *Workingmen's* and the court in that case reached the opposite conclusion on the facts than it had reached in the *Noteman* case, which case has been the foundation case for most of the subsequent decisions on the point, we do not feel we can decide this case without careful consideration of the *Workingmen's* case.

Here, as in *Workingmen's*, the contract charge is a fixed amount computed in advance, adjusted to the amount of the loan, made known to the borrower in advance as a "used" charge, which is not related to the duration of the loan and is not refundable on prepayment. On the other hand, here the contract charge is not allocated for specific services, while in *Workingmen's* it was apparently specifically "allocated, by agreement with the borrower, to the expense of 'investigation, identification, inspection and appraisal'" of the credit and security of the borrower; and the charge here is not actually collected in advance. But it seems to us these distinctions are more imaginary than real, are more of form than substance, unless it is shown that the charge is actually used to cover the cost of the services specified, and those specified are services to the borrower rather than to the lender or services normally required in the operation of a small loan business. We do not think the mere fact that the contract designates certain uses to which the funds will be put makes the charge any

less a fee paid by the borrower for use of the lender's money, unless it is shown that the charge was actually used for such purposes and the charge is justifiably a charge to the borrower separate from interest. Unless such can be shown, we believe the service charges made by small loan companies must be considered interest because basically the nature of the small loan company business is to make a profit in the form of interest on money loaned and the borrower is interested only in obtaining the loan and pays whatever is required of him to get the use of the lender's money. And this is so even though the charge is not a mere cloak to hide usury but is a charge allowed by statute to cover the high cost of operating a small loan business and the greater risks involved.

So while the contract charges involved in this case are somewhat similar in form to those involved in the *Workingmen's* case, and the total thereof is stipulated to constitute more than 20 percent of petitioner's gross income, we do not think the evidence proves that all of this income or a part thereof constituting at least 20 percent of petitioner's gross income is a charge truly separable from interest. While the evidence tends to indicate that the cost to petitioner of performing the various functions mentioned above possibly equaled the total it received from contract charges, the evidence provides no basis for determining the cost of performing services that can clearly be said to be rendered for the borrower as distinguished from the general cost of operating a business of this nature. We do not believe that fees charged the borrower, whose only concern is obtaining the use of lender's money, to defray the ordinary and necessary expenses incurred by the lender in conducting a small loan business are truly separable from interest. Consequently, we must conclude that at least 80 percent of petitioner's gross income in the tax periods involved constituted interest and personal holding company income under the applicable statutes. If the charges had been for specific services which the borrower would otherwise have to pay a third person to render, the situation might be different.

In fact the evidence in this case, and the facts in the other cases cited above, would seem to indicate that because of its nature a small loan business cannot be operated at a profit if it charges only the interest authorized under usury statutes. This is supported by the fact that most, if not all, of the State statutes regulating small loan companies permit them to charge interest or fees or a combination of both which exceed the rates allowable under the usury laws. But the fact that the excess charges are authorized by State law to cover the additional costs of operating small loan businesses does not mean they do not constitute interest under the internal revenue laws. We suspect that the term "lawful interest" used in the provisions of section 542(c) of

the 1954 Code exempting regulated small loan companies recognizes this and was used to avoid the issue here raised.

While we recognize the equities of petitioner's plea, all of the cases cited above stand for the proposition that the personal holding company tax applies to small loan companies, even though they are operating companies, if they fall within the ambit of the statute. We must hold for respondent on this issue.

*Decision will be entered for the respondent.*