NORTH AMERICAN LOAN & THRIFT COMPANY No. 2 (NOW KNOWN AS NORTH AMERICAN FINANCE CORPORATION OF FULTON COUNTY), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67400. Filed November 2, 1962.

*Robert Ash, Esq.,* and *Carl F. Bauersfeld, Esq.,* for the petitioner.
*James E. Johnson, Jr., Esq.,* for the respondent.

320

OPINION.

RAUM, *Judge:* 1. *Amortization deduction.*—On its 1952 corporate income tax return petitioner deducted an amount of $4,804.70 as "amortized premiums on loans purchased." The Commissioner disallowed this deduction. In its original petition to this Court, petitioner changed its theory in regard to this item and alleged that it was deductible as a ratable portion of an amount paid for a covenant not to compete. By amendment to the petition, petitioner again adopted the theory of the return and alleged, in the alternative, that the item was deductible as part of the amortization of a premium paid for loans purchased with a known life. On brief, petitioner argues only this latter theory.

The facts which give rise to this controversy are set forth in our findings and may be briefly summarized. In October 1950, petitioner purchased all of the issued and outstanding stock of Georgia Finance, Inc., from W. D. Acker for $84,977.27. It immediately liquidated Georgia Finance, taking over all the assets and liabilities. The principal assets thus acquired by petitioner consisted of 611 small-loan accounts which petitioner anticipated would be outstanding for an average of about 14 months. Based on the fact that the price paid for the Georgia Finance stock exceeded that corporation's net worth as of the date of purchase, petitioner capitalized an amount of $11,444.48 on its books in an account called "Unamortized premiums on loans purchased." On returns filed prior to 1952, petitioner claimed deductions totaling $6,639.78 from this account. As noted above, at issue herein is the deduction of the balance of $4,804.70 in 1952.

The parties are in agreement that the assets acquired by petitioner upon the liquidation of Georgia Finance had a basis equal to that of the Georgia Finance stock. *Kimbell-Diamond Milling Co.*, 14 T.C. 74, affirmed per curiam 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827. The parties are not in agreement on the allocation of that

basis to the assets acquired and, specifically, as to the proper allocation of the $11,444.48 capitalized by petitioner.

While the evidence tends to support petitioner's initial position on its books of account and on its return for 1952 that the amount capitalized was in fact paid as a premium for the 611 loan accounts acquired from Georgia Finance, the short answer is that such theory cannot sustain the disputed deduction in 1952. Petitioner's own evidence indicates that it anticipated when it acquired these 611 accounts that their average life in its hands would be about 14 months, and its actual experience in servicing these accounts in fact verified this expectation. Thus, assuming that petitioner was entitled to amortize the total premium paid therefor, petitioner admits it should have done so over their known life of 14 months. On brief, petitioner states that "the life of the loans receivable was definitely known and therefore capable of being depreciated or amortized over their life of 14 months." Since petitioner purchased the accounts through the purchase of the Georgia Finance stock in October 1950, this 14-month period had fully expired prior to 1952, the taxable year in issue. It follows that on the evidence presented, petitioner is not entitled to any amortization deduction in 1952 with regard to the premium paid for loans purchased.

Nor is petitioner entitled to the deduction on the alternative theory that the amount in question is deductible as a ratable portion of an amount paid for Acker's 2-year covenant not to compete. Assuming that petitioner has not abandoned this alternative point by failing to argue it on brief, it has not proved that either Acker or it regarded any portion of the purchase price of the Georgia Finance stock as payment for the covenant. On the contrary, the evidence presented indicates that the purchase price of the stock was determined on the basis of the value of Georgia Finance's 611 active accounts to petitioner, and that the covenant was added as a matter of routine protection for petitioner as purchaser. Thus, as indicated above, it appears that any value (over Georgia Finance's net worth) paid by petitioner was paid as a premium for the accounts acquired and to some extent possibly to acquire any goodwill inherent in Acker's going business, but to no extent for Acker's covenant not to compete. In these circumstances, no deduction in regard to the covenant not to compete is allowable. Cf. *Harold J. Burke*, 18 T.C. 77; *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278, 285–286, affirmed 282 F. 2d 919 (C.A. 4), certiorari denied 366 U.S. 902; *Ray H. Schulz*, 34 T.C. 235, 246–250, affirmed 294 F. 2d 52 (C.A. 9).

We hold that the Commissioner did not err in disallowing petitioner's claimed amortization deduction in the taxable year 1952.

2. *Borrowed capital.*—In computing the excess profits credit based

on invested capital under sections 436–439 of the 1939 Code, a corporate taxpayer is entitled to include 75 percent of its "borrowed capital," as that term is defined in section 439,[2] within its total invested capital. Petitioner included the daily average amount of the face value of its outstanding "Certificates of Investment" within its borrowed capital when computing its invested capital credit. The Commissioner determined that petitioner's certificates do not constitute borrowed capital under the statute.

We consider first the purpose of the invested capital credit which is here in issue. The credit is designed to permit a corporate taxpayer a given rate of return on its invested capital, which is defined to include equity capital, retained earnings, and three-fourths of its outstanding borrowed capital, before the imposition of the excess profits tax. See S. Rept. No. 2679, 81st Cong., 2d Sess., p. 7; Summary of H.R. 9827 "The Excess Profits Tax Act of 1950" As Agreed To By The Conferees, p. 4. Thus, the credit in a sense determines the normal profits of the enterprise, based on the capital invested therein, which should not be considered "excess" for purposes of this special tax on profits.

The question herein is whether petitioner's certificates in fact reflect borrowed capital upon which it is entitled to the statutory rate of return as a part of its excess profits credit. Accordingly, in terms of the definition of borrowed capital in section 439, *supra*, we must decide whether in substance these certificates represent an "outstanding indebtedness" of petitioner "incurred in good faith for the purposes of the business."

Preliminarily, we note that the status of these certificates under applicable State law is in no way determinative of the litigated question, since we are here applying a definition contained in a Federal statute. Thus, while the form of these certificates may be considered "securities" under Georgia law and petitioner's method of doing business in full compliance with the laws of that State, the true substance of petitioner's certificates and the transactions in which they play a part must be appraised in the light of the statutory definition of borrowed capital in the 1939 Code and the underlying purposes of the invested capital credit in the Federal statute. Cf. *Burnet* v. *Harmel*,

[2] SEC. 439. BORROWED CAPITAL.

(a) AVERAGE BORROWED CAPITAL.—For the purposes of this subchapter, the average borrowed capital for any taxable year shall be the aggregate of the daily borrowed capital for each day of such taxable year, divided by the number of days in such taxable year.

(b) DAILY BORROWED CAPITAL.—For the purposes of this subchapter, the daily borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. * * *

287 U.S. 103, 110; *Morgan* v. *Commissioner*, 309 U.S. 78, 81; *United States* v. *Pelzer*, 312 U.S. 399, 402–403; *Morris Plan Bank of New Haven* v. *Smith*, 125 F. 2d 440, 441 (C.A. 2); *Commissioner* v. *Valley Morris Plan*, 305 F. 2d 610, 619–620 (C.A. 9), rehearing denied 305 F. 2d at 629–630.

Our findings demonstrate the way in which petitioner's certificates were issued and used in its business. All borrowers from petitioner were required to "purchase" such certificates to qualify for a loan from petitioner up to the face amount of the certificates so "purchased." In theory, nonborrowers might also purchase these certificates, but the record affirmatively shows that there were no sales to nonborrowers in the taxable years before us, and there is no evidence that a nonborrower *ever* purchased such certificates. Indeed, in view of the fact that the installment note executed by the applicant (purportedly for the certificate) bore interest at the stated rate of 8 percent while the certificate in turn paid interest at the rate of only 3 percent, it is difficult to imagine why anyone would ever enter into any such transaction to buy a certificate unless he were economically coerced to do so in order to obtain a loan. As indicated, borrowers signed an installment note at 8-percent interest (pledging their household goods, automobile, and other assets) purportedly in payment for the certificate, which in turn was to bear 3-percent interest per annum, and in every case the borrower then used the certificate as "collateral" to secure the "term" loan (at a separate 8-percent interest) which was the basis for his coming to petitioner in the first place. When the term note came due, the borrower according to plan had made all his payments on the installment note used in theory to pay for the certificate, and in every case the certificate was then used to discharge his indebtedness in a like amount on the term note. Thus, petitioner never gave up possession or control of the certificates in issue. While in theory a borrower had the option to repay his "term" note to petitioner with other funds and take possession of the certificate as an investment returning 3 percent per annum, no borrowers elected to do this. The net effect of coupling certificates with all small loans made by petitioner was to require the borrower to sign two notes to petitioner instead of one for each loan he needed and thereby to pay a net total of interest vastly in excess of the purported 8 percent.[3] It also had the effect of requiring the

---

[3] Adverting to the example set forth in the findings, the maker of the $100 1-year term note was given $90 in cash, after deducting $8 in interest and $2 as a so-called service charge. Assuming that the $2 service charge was bona fide and did not include any further hidden interest, cf. *Western Credit Co.*, 38 T.C. 979, the borrower actually received a loan of at most $92, although he gave a term note in the face amount of $100 therefor. He discharged his liability on that note by paying $108 on the installment note. And since the certificate issued in respect of the installment note paid him $3, he made net payments in the amount of $105 to discharge what in effect was a $92 loan. Thus, the

borrower to repay his loan to petitioner in installments, so that petitioner had the use of part of the funds lent its borrowers continually during the terms of their loans.

In these circumstances, looking to the substance of petitioner's small-loan transactions and not merely their form, we think that petitioner's certificates in no real sense represented an indebtedness of petitioner to its customers. These customers were described at the trial herein by petitioner's vice president as persons "who can't make loans or can't obtain money from banks, credit unions, friends, or relatives. They come to us because they are facing a real emergency. They are willing to pay the price to get the money if they can." Petitioner would have us believe that such persons, at the instant they borrow money from petitioner, immediately lend a like amount of money back to petitioner on its certificates. We can accept no such fiction. Petitioner's customers are borrowers; they are neither lenders nor investors. They have no funds to lend to petitioner's business or to anyone else. They come to petitioner because they need funds, and their need is sufficient that they are willing to pay the price exacted from them through the medium of these inextricably interrelated transactions in order to obtain their loans. To paraphrase the language of the Supreme Court in *Griffiths* v. *Helvering*, 308 U.S. 355, 357, giving effect to the substance of a transaction rather than to its form: That is the crux of the business to petitioner, and that is the crux of the business to us.

In reality in every case the money paid by petitioner's borrowers on the installment note constituted merely a partial repayment of the money lent by petitioner to the borrowers. In no case did this money represent new capital lent to petitioner. In substance it represented a small portion of a revolving fund of money lent by petitioner to its borrowers on one note and returned by its borrowers in the form of installment payments on a separate note. The record fails to show that petitioner borrowed a single penny of additional capital through its certificates in 1952 and 1953.[4] We hold, therefore, that petitioner's certificates do not in fact constitute borrowed capital as defined in section 439, *supra*.

---

cost to him of that $92 loan was $13. Assuming that he had had the use of the $92 for the full 12-month period, the true rate of interest in fact paid by him would be somewhat in excess of 14 percent. But the borrower did not have the full use of that money over the 12-month period, in view of the installments paid by him during the course of the year. When this factor is taken into account, the true rate of interest, considering the transaction as a whole, is closer to 28 percent. And if the $2 service charge is regarded as additional interest (cf. *Western Credit Co., supra*), the true rate of interest would be even higher.

[4] No question is here presented as to whether any interest incorporated in the installment payments resulted in retained earnings which increased petitioner's invested capital. The sole issue is whether petitioner is entitled to a credit for "borrowed capital" in accordance with section 439.

On brief petitioner presses the point that it "conducted its business in accordance with the specific requirements of the Georgia law and it cannot be said that its method of conducting its business was a sham or was for the purpose of avoiding Federal income tax." Granted all this be true, petitioner's position herein is not improved. We pass no judgment on the Georgia statute under which petitioner conducts its business nor on the Georgia cases, cited by petitioner, which appear to hold that such business does not violate the usury laws of that State. While there was some general testimony at the trial of this case to the effect that a small-loan business such as that conducted by petitioner could not have been operated profitably at the legal rate of interest of 8 percent per annum in Georgia, we do not consider such evidence controlling. Neither the legality nor the propriety of petitioner's use of its certificates is before us. We are concerned only with the substance of these certificates for purposes of applying the definition of borrowed capital in the Federal statute.[5] On the evidence before us, we think it clear that petitioner did not in fact intend to borrow money from its customers by the use of its certificates, and certainly its customers did not in fact intend to lend petitioner money by the use of such certificates. On the contrary, the facts show that in every case the substance of the transaction was that petitioner was the lender and its customer was the borrower. The use of the many forms which played a part in this process, the application blank for the certificate, the certificate itself, the installment note in purported payment for the certificate, the term note upon which the customer finally obtained his loan, all were part and parcel of but a single transaction, the lending of money by petitioner to its customers at a profit. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering,* 302 U.S. 609, 613.[6] In reality, the certificate to-

---

[5] In this regard we think particularly relevant what was said recently by the Court of Appeals for the Fifth Circuit in *United States* v. *General Geophysical Company,* 296 F. 2d 86, rehearing denied 296 F. 2d 90, certiorari denied 369 U.S. 849, rehearing denied 369 U.S. 891. The court stated (296 F. 2d at 90) :

"The taxpayer asserts that the transactions were prompted by a valid business purpose and were effected without a motive of tax avoidance. We accept these assertions, which are supported by the trial judge's findings, as true. They lend support to the taxpayer's case, but they do not control the disposition of the case. Intent often is relevant in questions of taxation, particularly where the bona fides of a transaction is called into question, but in most cases tax treatment depends on what was done, not why it was done."

[6] *Minnesota Tea* is but one of a vast number of cases in a wide variety of Federal tax problems where the separate, formal steps, constituting merely components of a single transaction, were synthesized to arrive at the substance of the transaction and the tax consequences flowing therefrom. Cf., e.g., *Starr* v. *Commissioner,* 82 F. 2d 964 (C.A. 4), certiorari denied 298 U.S. 680; *Helvering* v. *Elkhorn Coal Co.,* 95 F. 2d 732 (C.A. 4) ; *Kimbell-Diamond Milling Co.,* 14 T.C. 74, affirmed per curiam 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827; *S. Nicholas Jacobs,* 21 T.C. 165, affirmed 224 F. 2d 412 (C.A. 9) ; *Virginia W. Stettinius Dudley,* 32 T.C. 564, affirmed per curiam 279 F. 2d 219 (C.A. 2).

gether with the installment note which was used by the customer to obtain the certificate represented nothing more than a means by which the customer was to repay his loan from petitioner by installments during the term of the loan. Petitioner obtained no new, added capital by the use of these forms; it obtained only the repayment of the money it had lent to its customers, with additional interest as an added, important feature. Thus, we conclude that in substance petitioner's certificates do not represent an outstanding indebtedness of the corporation within the meaning of the Internal Revenue Code.

However, even if we were persuaded that these certificates were true debts of petitioner, we think that these particular certificates still would fail to meet the statutory definition of borrowed capital. Petitioner's liability on all of these certificates was at best contingent upon the borrower paying the term note for which they served as "collateral," and in practice the latter note was paid only if the borrower made timely payments on his installment note given in payment for the certificate. As a contingent liability, it is clear that no "outstanding indebtedness" existed as required by the statutory definition of borrowed capital. Cf. *Frazer-Smith Co.*, 14 T.C. 892, 899–900; *C. L. Downey Co.*, 10 T.C. 837, 839–840, affirmed 172 F. 2d 810, 812 (C.A. 8). Thus, in form as well as in substance, the certificates in issue fail to qualify as borrowed capital. We hold that the Commissioner correctly refused to allow the inclusion of any value for these certificates in the determination of petitioner's allowable invested capital credit.

Reviewed by the Court.

*Decision will be entered for the respondent.*

FAY, *J.*, did not participate in the consideration and disposition of this case.

———

FORRESTER, *J.*, dissenting: I fully agree with the majority that since we are here applying a definition (of borrowed capital) contained in a Federal statute, our consideration of the problem is not terminated by the fact that these certificates do so qualify under Georgia law.

I fully disagree with the majority's statement, "the status of these certificates under applicable State law is *in no way determinative* of the litigated question," (emphasis supplied) for it is not disputed that strict compliance with that very State law was a prerequisite to realization by this petitioner of more than 8-percent interest.

We are here dealing with a tax on income, and absent this method of doing its business, in compliance with the State law, petitioner's

income would have disappeared, or at least have been greatly reduced.[1]

The broad Congressional purpose behind the enactment of the borrowed capital provision of the excess profits credit based on invested capital is clear. It is to provide relief by means of a credit for 75 percent of funds procured by borrowing which were actually used in the business in order to produce further taxable income. The Senate Finance Committee stated (S. Rept. No. 2679, 81st Cong., 2d Sess., p. 10 (1950)) :

> Borrowed capital, under your committee's bill, is indebtedness (but not including interest) which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. This is substantially the same definition as appears in the House bill. However, your committee's bill limits the amount to be considered as borrowed capital to outstanding indebtedness *"incurred in good faith for the purposes of the business."* * * * [Emphasis supplied.]

See also Summary of H.R. 9827 "The Excess Profits Tax Act of 1950" prepared by the staff of the Joint Committee on Internal Revenue Taxation, sec. 5(c), p. 6, providing in part:

> *Definition of borrowed capital.*—Borrowed capital is indebtedness * * * which is evidenced by a * * * certificate of indebtedness * * *. However, the amount to be considered as borrowed capital is limited to outstanding indebtedness *"incurred in good faith for the purposes of the business."* * * * [Emphasis supplied.]

and section 40.439–1(d), Regs. 130, which reads: "In order for any indebtedness to be included in borrowed capital it must be *incurred in good faith for the purposes of the business* and not merely to increase the excess profits credit. [Emphasis supplied.]"

It seems clear to me that during the years in issue petitioner had available cash on a daily average basis in the amounts of $166,293.46 and $186,007.35 which had been paid in by the certificateholders in cash. Respondent argues that these amounts were simply the daily average of the amounts paid on the installment notes and therefore entitled to no credit.

I feel that respondent's analysis is superficial. Of course, these amounts were what had been paid in on the installment notes, but in a very real sense they were something more; they were the holders' equities in the certificates at any given time and petitioner actually had these amounts of cash on hand which it could, and did, lend to

---

[1] The majority state that there was some "general testimony" to the effect that petitioner's business could not have been operated profitably at the legal rate of interest of 8 percent per annum in Georgia. In my view this testimony was convincing. It was by petitioner's vice president and general counsel as follows :

"We would stay in business just about one month, because we would lose money so fast. You can't loan money on installments, and take those myriad of detailed transactions, at any 8% interest rate. You wouldn't be in business 30 days. Mr. Acker wasn't making any money at 18%."

new borrowers. These same amounts were also represented by petitioner's net liabilities (after all offsets) on the certificates, and it is these net liabilities which I feel do qualify as a part of the borrowed capital credit.

The main reliance of the majority in allowing petitioner no credit on the certificates is expressed: " 'A given result at the end of a straight path is not made a different result because reached by following a devious path.' * * *" The following cases are cited: *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613; *Starr* v. *Commissioner*, 82 F. 2d 964 (C.A. 4), certiorari denied 298 U.S. 680; *Helvering* v. *Elkhorn Coal Co.*, 95 F. 2d 732 (C.A. 4); *Kimbell-Diamond Milling Co.*, 14 T.C. 74, affirmed per curiam 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827; *S. Nicholas Jacobs*, 21 T.C. 165, affd. 224 F. 2d 412 (C.A. 9); *Virginia W. Stettinius Dudley*, 32 T.C. 564, affirmed per curiam 279 F. 2d 219 (C.A. 2); but a critical examination of these cases reveals that in each, the identical result as was attained could have been reached by a direct method but would have resulted in more taxes being payable. As expressed by the Supreme Court in *Minnesota Tea Co.* v. *Helvering*, supra at 613:

The conclusion is inescapable, as the court below very clearly pointed out, that by this roundabout process petitioner received the same benefit "as though it had retained that amount from distribution and applied it to the payment of such indebtedness." * * * The preliminary distribution to the stockholders was a meaningless and unnecessary incident in the transmission of the fund to the creditors, all along intended to come to their hands, so transparently artificial that further discussion would be a needless waste of time. * * *

I therefore regard these cases as inapposite here where more than 8-percent interest could not have been realized by petitioner absent the certificates.

I would hold therefore that such daily average amounts ($166,293.46 in 1952 and $186,007.35 in 1953) are within the spirit and purpose of section 439(b)(1) and that such amounts are allowable as a part of petitioner's borrowed capital.

OPPER and DAWSON, *JJ.*, agree with this dissent.