**MACEY'S JEWELRY CORPORATION,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 22845.

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1967.

Robert M. Ervin, Wilfred C. Varn, Tallahassee, Fla., Jerome Goldman, Cincinnati, Ohio, for appellant.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Stephen Paley, Attys., Dept. of Justice, Washington, D. C., Clinton Ashmore, U. S. Atty., Tallahassee, Fla., for appellee.

Before WISDOM, BELL and GOD-BOLD, Circuit Judges.

WISDOM, Circuit Judge:

This is an action for refund of federal excise taxes amounting to $859.79 paid by the plaintiff-appellant, Macey's Jewelry Corporation, during 1961 and part of 1960. When the taxpayer sells an article of jewelry on credit, its practice is to add a ten per cent "budget charge" to the balance remaining after deducting the customer's down payment. The question for decision is whether this budget charge is a true finance charge and as such not a part of "the price for which * * * [the jewelry] is sold", within the meaning of the retailers excise tax provisions of the Internal Revenue Code of 1954 (26 U.S.C. §§ 4001 and 4051).[1]

The case was submitted to the court below on a stipulation of facts, affidavits, depositions, and cross-motions for summary judgment. The district court concluded that there was no genuine issue as to any material fact and granted judgment for the United States. 242 F.Supp. 25.

 We reverse and remand. We hold that an extra *charge for goods* sold on credit *may* be a true finance charge not within the price for which the goods are sold. Here the realities of the jewelry business testify against the government. The record shows that Macey's budget charge included some interest charges, some bookkeeping costs, and some other expenses attributable to the extension of credit. The taxpayer asserts that the actual costs exceeded the 10 per cent budget charge; the government disputes each time and asserts that all were part of the regular purchase price. The extent to which these costs were an added expense not within the selling price of the jewelry sold is a disputed material issue of fact. This issue is better resolved by a trial on the merits than by a hearing on motions for summary judgment.

## I.

26 U.S.C. § 4001 imposes the tax in issue:

"There is hereby imposed upon the following articles sold at retail a tax equivalent to *10 per cent of the price for which sold*:

All articles commonly or commercially known as jewelry whether real or imitation, * * * *" (Emphasis added.)

26 U.S.C. § 4051 provides that in determining the price for purposes of computing the excise tax, certain specific charges are to be included and others are not to be included:

"In determining for the purpose of this chapter, the price for which an article is sold, there shall be included any charge for coverings and containers of whatever nature, and any charge incident to placing the article in condition packed ready for shipment, but there shall be excluded the amount of tax imposed by this chapter, whether or not stated as a separate charge. A transportation, delivery, insurance, installation, *or other charge* (not required by the foregoing sentence to be included) *shall be excluded* from the price only if the amount thereof is established to the satisfaction of the Secretary or his delegate, in accordance with the regulations. There shall also be excluded, if stated as a separate charge, *the amount of any retail sales tax imposed by any State or Territory or political subdivision* of the foregoing, or the District of Columbia, whether the liability for such tax is imposed on the vendor or the vendee." (Emphasis added.)

The Commissioner has never issued any regulations based on Section 4051.

 A "finance charge", as such, is not referred to in Section 4051. The

---

1. Retailer's Excise Tax as Imposed on Jewelry and Related Items, Int.Rev. Code of 1954, ch. 736, § 4001, 68A Stat. 473. The tax was repealed Pub.L. 89-44, Title I, § 101(a), June 21, 1965, 79 Stat. 136, effective June 22, 1965.

Government freely admits, however, that a "true" finance charge is within the classification of charges which may be excluded from the selling price under Section 4051. Thus in Berman's Jewelry Store, Inc. v. United States, 4 Cir. 1952, 198 F.2d 675, 33 A.L.R.2d 1445, relied on by both parties, the court said:

"There can be, of course, such a thing as a 'finance charge' or 'carrying charge' on installment sales and they are not unusual. And where such a charge is confined to and is truly representative of the added expense imposed upon the vendor by installment selling (as distinguished from cash sales), it is not to be included in the tax base. Such a charge may properly include lawful interest on the deferred portion of the purchase price, the cost of the book-keeping necessary to keep the records of such sales, and any other expense directly attributable to the fact that payment is to be made in installments instead of in cash."

The Commissioner issued a number of revenue rulings based on *Berman*, culminating in Rev.Rul. 57–437, 1957–2 Cum.Bull. 717. In that ruling the Commissioner announced his requirements that a credit charge had to meet before it could be excluded from the taxable selling price:

"[I]n order for a 'service' charge to be excludable from the taxable selling price of an article subject to the retailers excise tax, it is necessary that (1) the charge be based upon the unpaid balance of the selling price and the length of time agreed upon for payment of the balance due, (2) the customer must receive a credit or adjustment of the charge proportionate to any accelerated payment, (3) the amount of the charge must be shown as a separate item on the sales invoice or some other document pertaining to the transaction so that the customer is aware of his privilege of pre-paying his account so that he may take advantage of paying a lesser charge, and (4) there must not be present any factors which would negate the bona fides of the transaction." 1957–2 Int. Rev.Cum.Bull. at 719.

■ If this ruling were definitive, the taxpayer's budget charges would have to be considered part of the sales price, for they fail to meet the first two requirements. The court in Schneer's, Inc. v. Tomlinson, S.D.Fla. 1965, 247 F.Supp. 990, dealing with a finance charge almost identical with that employed by Macey's, accepted the revenue ruling as definitive authority and held for the government. Revenue rulings, however, are not authority having the force of law, to be automatically applied in each and every case. A "Revenue Ruling", since it is "an official interpretation by the Service",[2] should be given weight. 26 C.F.R. § 601.201(a) (5). But it is "a written statement * * which interprets and applies the tax laws to a specific set of facts". 26 C.F.R. § 601.201(a) (5). The Service cautions against over reliance on a ruling:

"Since each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same. Furthermore, they should consider the effect of subsequent legislation, regulations, court decisions, and Revenue Rulings." 26 C.F.R. § 601.201(1) (10).

See United States v. Bennett, 5 Cir. 1951, 186 F.2d 407, 410; Tandy Leather

---

2. The purpose of a published revenue ruling is simply to "inform" * * * both the taxpayers and the personnel of the Service as to *the Commissioner's position* * * * [emphasis added]. Remarks of Mitchell Rogovin, Chief Counsel of the Internal Revenue Service, "The Four R's: Regulations, Rulings, Reliance and Retroactivity," 43 Taxes 756, 765 (1965). See also Fischgrund, Federal Excise Taxes, 14 So.Cal. Tax Inst. 889, 912–14 (1962).

Co. v. United States, 5 Cir. 1965, 347 F.2d 693.

## II.

Both the taxpayer and the Government agree with the *Berman* court's recognition of the taxpayer's right to exclude a "true finance or carrying charge". The critical question, therefore, is whether Macey's budget charge is "truly representative of the added expense imposed upon the vendor by installment selling". The Court in *Berman* sets forth the elements that make up excludable added expense: (1) interest on the deferred portion of the purchase price, (a) bookkeeping costs, and (3) "any other expense directly attributable to the fact that payment is to be made in installments instead of in cash".

The patent weakness in Revenue Ruling 57–347 is that it ignores the second and third elements of expenses connected with extending credit which *Berman* recognizes. The Government gives no explanation for this omission.

The first two requirements of the ruling refine *Berman's* allowance of interest: the only finance charge the Government will recognize is one based on interest computed on a per diem basis.[3] The computation of interest as if it were a charge on the use of money obtained through a loan would of course clearly establish that the charge is indeed interest. But this is an unrealistic criterion to apply rigidly to a merchant's extension of credit on a sale of goods. No one can deny that there is a cost of carrying installment sales, aside from the costs of bookkeeping, credit investigation, postage, collection, and other costs associated with credit sales as opposed to cash sales. This cost may not be "interest" in a banking sense but it

is a cost directly attributable to the fact that the customer's payment is made over a period of time instead of in cash. Here the merchant has evidence showing that, to simplify his operations and reduce costs of bookkeeping, he elected to use a uniform finance charge that averages out as reasonably related to the total actual costs of carrying the deferred portion of the purchase price, plus bookkeeping costs, and other costs of extending credit. The taxpayer's method does not change the nature of the costs or cause these costs to evaporate. They are all costs that arise after the sale. They would not exist except for the fact that the merchant, not the purchaser, has the burden of carrying the difference between the purchase price and the down payment. They are directly related to the unpaid balance, not indirectly related to the purchase price.

## III.

We turn now to the record.

There is no evidence of deliberate evasion of excise taxes. Macey's, a retail jewelry store in Pensacola, Florida, handles its business in substantially the same way as other retail jewelers throughout the United States. A "budget charge" at Macey's is equivalent to a "carrying charge" or "service charge" at other stores. At the time the statute (Section 4051) went into effect and since then, the jewelers throughout the United States continued to add and collect the finance charge using the same method they have always followed. The Commissioner has never issued a regulation that would have ended the practice or defined the terms under which it could have been continued and the tax on such charges passed on by the jeweler, as tax collector, to the customer. The statute was repealed in 1965.[4]

3. The Service itself, however has ruled that finance or service charges which are not related to the length of the loan are simply interest. Rev.Rul. 57–541, 1957–2 Cum. Bull. 319. On facts similar to the instant case, it was likewise so held in Western Credit Co. v. Commissioner, 38 T.C. 979 (1962), affirmed per curiam, 325 F.2d

1022 (9th Cir., 1963) (an income tax case). See also North American Loan & Thrift Co. v. Commissioner, 39 T.C. 318, 328–329 (ftnt. 3), affirmed per curiam, 319 F.2d 132 (4th Cir., 1963).

4. Retail jewelers cannot now, of course, pass on the assessed tax to their customers.

The taxpayer had only one stated price for any item of merchandise. Cash customers (including those who paid in full in 90 days) paid only the stated price. Customers to whom credit was extended for a period of more than 90 days but less than one year paid the stated price plus 10 per cent of the credit extended. For periods beyond a year, one per cent was added to the charge for each month.

The charge was not added to the *list price*, as in *Berman*. Macey's added to the list price the federal excise tax of 10 per cent and the Florida sales tax of 3 per cent—then subtracted the amount of the down payment. Ten per cent of the *net balance* was added as the budget charge.

There is a demonstrably direct correlation between the amount of the finance charge and the amount of credit extended. For example, if two customers each buy a $100 ring, the price for each ring would be:

| | |
|---|---|
| $100.00 | Sales Price |
| 10.00 | Federal Tax |
| 3.00 | State Sales Tax |
| $113.00 | |

If Customer A pays $10 down, the balance due is $103, and the budget charge is $10.30. But if Customer B pays $50 down, the balance due is $63, and the budget charge is $6.30. For different priced articles, purchased by different customers, if the respective down payments result in the same balance due from each customer, the burget charge is the same in both cases even though the selling price was entirely different. If one customer buys a $150 ring and makes a down payment of $39.50, his budget charge is computed as follows:

| | |
|---|---|
| $150.00 | Sales Price |
| 15.00 | Federal Tax |
| 4.50 | State Sales Tax |
| $169.50 | Total |
| 39.50 | Down Payment |
| $130.00 | Balance Due |
| 13.00 | Budget Charge |

If another customer buys a $200 ring and makes a $96 down payment, his budget charge is computed as follows:

| | |
|---|---|
| $200.00 | Sales Price |
| 20.00 | Federal Tax |
| 6.00 | State Sales Tax |
| $226.00 | Total |
| 96.00 | Down Payment |
| $130.00 | Balance Due |
| 13.00 | Budget Charge |

In *Berman* the finance charge was always 10 per cent of the list price; here the budget was always 10 per cent of the balance due.

There is a serious and material dispute as to the costs of the taxpayer's credit operations. The taxpayer submitted evidence that the listed costs of operating its credit department ranged from 6.8 per cent of sales for one year to 7.3 per cent of sales the second year. If these figures are correct and if interest at the rate of 5 or 6 per cent is added, plus, perhaps, 1 to 2 per cent for losses on installment sales, it is apparent that the 10 per cent budget charge is less than the actual costs of extending credit on the customers' unpaid balance. The Government contends that all or at least some (not stated) of the alleged costs of extending credit would have to be included as overhead in the purchase price had there been no financing plan.

There is also a serious and material dispute over the pay-out period as a factor in the taxpayer's use of ten per cent as the average interest rate. The taxpayer asserted that the 10 per cent budget charge was based on an assumed pay-out over twelve months; that "over 90% of the customers ask for a twelve-month pay-out." The Government denies that this was the standard request pay-out time. An affidavit of one of the Service agents shows that 42 per cent of the contracts called for full payment within one to three months, 67 per cent for payment within one to six months, 80 per cent for payment within one to nine months, and 4.08 per cent for pay-

ment within one to twelve months. However, the taxpayer insists that the average pay-out time for all accounts was nine and one-half months (including the 30 to 90 day accounts); almost half of the installment customers took longer to pay their accounts than their contract required, and, on the average, took over eight months longer. The relationship between pay-out record and the amount of the assumed average charge is material to determining the reasonableness of the charge.

Some of the costs do not depend in any way on the term over which repayment is made. An important part of the costs involves the original credit investigation. This includes a report from the Retail Credit Bureau (at an average cost throughout the United States of from 75 cents for each local telephone report to $2.50 for written reports on out of town customers) and the cost of checking references, directories, job and family status, etc. The cost of follow-up calls and correspondence in connection with actual collection is, of course, considerable. So too are the pure bookkeeping expenses of maintaining files and records and receiving and recording payments. There is no basis for allocating any of these costs on a per diem basis. In other words, the allocation of such costs—since they either are fixed costs or vary for reasons other than length of payout—between customers solely on the basis of the term of the loan would not be a fair or equitable method. A large part of the business done by credit jewelers on the installment basis is with wage earners in the lower brackets, and often installment payments are made on a weekly rather than a monthly basis, and many sales are in amounts of less than $100. A $75 loan payable in weekly installments over a period of twenty-five weeks could involve greater bookkeeping and other costs than a $75 loan repayable monthly over a period of twelve months.

The excise tax is imposed on the price of goods sold, not on a charge for credit. Perhaps the taxpayer's budget charge of 10 per cent was excessive. Perhaps

some of the elements relied on by the taxpayer as credit costs should be treated as part of the purchase price. But the taxpayer should have the opportunity to prove at a trial on the merits its costs of extending credit on sales where the payment was to be made in more than ninety days.

 This is a case where precision is impossible to achieve. It cannot be said as a matter of law that all of the taxpayer's finance charge was within the price of the goods sold on credit. And inability to fix the precise figure attributable to the taxpayer's extension of credit on installment sales does not justify treating all of the charge as part of the sales price. Compare Cohan v. Commissioner of Internal Revenue, 2 Cir. 1930, 39 F.2d 540; 4A Mertens, Law of Federal Income Taxation § 25.04.

The judgment is reversed and remanded for proceedings consistent with this opinion.