## W. A. WHITE BROKERAGE COMPANY v. EDWARD A. COOPERMAN AND OTHERS.[1]

March 1, 1940.

No. 32,280.

[1]Reported in 290 N. W. 790.

*Stinchfield, Mackall, Crounse, McNally & Moore* and *M. D. Nicholson,* for appellant.

*Samuel Saliterman* and *Max Rotenberg,* for respondent Cooperman Fruit Company.

*Faegre, Benson & Krause* and *Armin M. Johnson,* for respondent Northwestern National Bank & Trust Company of Minneapolis.

Gallagher, Chief Justice.

The appeal is from two judgments, one entered against plaintiff in favor of defendant Northwestern National Bank & Trust Company of Minneapolis, a corporation, and the other entered against plaintiff in favor of defendants Edward A. Cooperman and Meyer Cooperman, copartners, doing business as the Cooperman Fruit Company.

Late in the afternoon of Saturday, August 10, 1935, a quantity of fruit shipped by J. E. Kenney of Anna, Illinois, was delivered to the Cooperman Fruit Company, defendant, in pursuance of a contract to sell entered into between defendant and Kenney, by plaintiff, his broker and agent. On the following Monday, Kenney instructed plaintiff to collect from the fruit company the amount to be paid for the shipment ($675) and to wire the same to a certain bank in Illinois. That afternoon the fruit company made and delivered to plaintiff, at its request as agent of Kenney, a check for $675 dated August 12, 1935, and drawn on defendant Northwestern National Bank & Trust Company to the order of plaintiff. Thereupon plaintiff purchased a money order in the amount of $650, which was wired to the Illinois bank for Kenney's account. The difference between the amount paid by plaintiff

for the money order and the amount of the check obtained by it from the fruit company represents brokerage commission retained by plaintiff.

At 9:45. a. m. on August 14, plaintiff took the fruit company's check and other checks and deposited them to its account in defendant bank. The teller made a notation in plaintiff's passbook showing the deposit of the aggregate amount of all the checks. The fruit delivered to defendant was discovered to be in bad condition; it was condemned and seized by the state department of agriculture. Consequently, defendant fruit company at 10:28 a. m. (about an hour after the deposit was made) notified the bank to stop payment on the check. Defendant bank returned the check to plaintiff and refused to allow it credit therefor.

Plaintiff made prompt but ineffectual attempts to obtain a return of the money sent by it to Kenney's bank. It then brought an action against Kenney and the fruit company in and before the United States Department of Agriculture which resulted in an order by the Secretary of Agriculture dismissing plaintiff's complaint as against the fruit company and awarding damages as against Kenney in the sum of $675 and costs. No appeal from this order was taken by plaintiff, and no part of the award has been paid. Defendant bank was not a party to this proceeding, and therefore as to it the order has no force.

The present action was commenced by plaintiff on November 8, 1937. The recovery sought was $675 (the amount of the check given by defendant fruit company to plaintiff) plus interest. Respondents were joined as defendants. The case was tried without a jury, and the court made findings of fact and conclusions of law in favor of both defendants. The judgments appealed from were thereafter entered.

Appellant contends that the findings of fact do not support the judgments because (1) when the check was presented to defendant bank by plaintiff and credited in its passbook the check was paid and the stop notice served about one hour later was ineffective; and (2) if the check was not paid, defendant fruit company, as drawer of the check, is liable to plaintiff.

1. Appellant argues that the bank became its debtor when the amount of the fruit company's check was entered in plaintiff's passbook and that the bank's attempt to avoid this obligation by charging back the amount of the check upon receipt of the fruit company's stop order was ineffectual.

Respondent bank concedes that at common law, absent a contrary express or implied agreement between the parties, such was the law. The common-law rule is thus stated in 2 Morse, Banks and Banking (6 ed.) § 569:

"When a check is presented for deposit drawn on the depository bank, the bank may refuse to pay it, or take it conditionally by express agreement, or by usage, * * *; but otherwise, if it pays the money, or gives credit to the depositor, the transaction is closed between the bank and the depositor, unless the paper proves not to be genuine, or there is fraud on the part of the depositor. The giving of credit is practically and legally the same as paying the money to the depositor, and receiving the cash again on deposit. The intent of the parties must govern, and presenting a check on the bank, with a pass book in which the receiving teller notes the amount of the check, is sufficient indication of intent to deposit, and to receive as cash. * * *"

Cases following this rule are: Oddie v. National City Bank, 45 N. Y. 735, 6 Am. R. 160; National Bank v. Burkhardt, 100 U. S. 686, 25 L. ed. 766; Bryan v. First Nat. Bank, 205 Pa. 7, 54 A. 480; Union State Bank v. Peoples State Bank, 192 Wis. 28, 211 N. W. 931. See also American Nat. Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. ed. 1310.

While no decision of this court involving the relation between one given credit in his passbook for the amount of a check drawn on the bank at which it was deposited and such depository bank has been called to our attention or found by us, the general rule as stated in cases involving deposits of paper at a bank which was not the drawee appears to be applicable apart from the statute. In Security Bank v. Northwestern Fuel Co. 58 Minn.

141, 144, 59 N. W. 987, Mr. Justice Mitchell, speaking for the court, said:

"Upon a deposit being made by a customer in a bank, in the ordinary course of business, of money, checks, drafts, or other negotiable paper received and credited as money, the title of the money, drafts, or other paper *immediately* becomes the property of the bank, which becomes debtor to the depositor for the amount, *unless a different understanding affirmatively appears.* In re State Bank, 56 Minn. 119, 57 N. W. 336, 45 A. S. R. 454." (Italics ours.)

Later cases in accord include South Park F. & M. Co. v. C. G. W. Ry. Co. 75 Minn. 186, 77 N. W. 796; Sisseton L. S. Shipping Assn. v. Drovers State Bank, 164 Minn. 484, 205 N. W. 447, 206 N. W. 394.

It is clear that unless the common law has been changed in this state by statute plaintiff must, apart from a contrary agreement between it and the bank, be held to have become a creditor of defendant bank at the time its deposit was entered in the passbook. The bank contends that the common-law rule was changed by 2 Mason Minn. St. 1927, § 7233-1, which provides:

"Any bank, * * * doing business in this state, in receiving items for deposit or collection, in the absence of a written agreement to the contrary, shall act only as the depositor's collecting agent and shall have no responsibility beyond the exercise of due care. All such items shall be credited subject to final payment in cash or solvent credits. Such bank shall not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. Such bank or correspondent may send items, directly or indirectly, to any bank including the payer, and accept its draft, check, or credit as conditional payment in lieu of cash. It may charge back any item at any time before final payment whether returned or not."

This section is L. 1927, c. 138, § 1, entitled: "An act relating to the handling by banks of items received for deposit, or collec-

tion." It was approved on April 11, 1927, and became operative 30 days thereafter. Our problem is to determine whether or not the legislature intended to change the common law with respect to deposits in the drawee bank by this enactment.

Appellant argues that no such change was intended. In ascertaining the validity of this contention we have but little aid in the prior adjudications of this court. Consideration of a decision (Hommerberg v. State Bank of Slayton, 170 Minn. 15, 212 N. W. 16, 17) filed January 21, 1927 (at a time when the legislative body which enacted § 7233-1 was, presumably, in session) is somewhat helpful in determining the meaning of the law. Involved there was the question of whether or not a bank at which a check on another bank was deposited was liable for the loss resulting when a correspondent chosen by it accepted the draft of the drawee in payment for the check. This court, on the authority of Federal Res. Bank v. Malloy, 264 U. S. 160, 44 S. Ct. 296, 68 L. ed. 617, 31 A. L. R. 1261, held the depository liable, saying at p. 18 of the opinion:

"Under the rule in the Malloy case, which is the rule in this and many other states, when a bank receives a check from its customer for collection, in the absence of an agreement to the contrary, it enters into a contract by implication to perform all such duties as are necessary for the protection of such customer, and, having undertaken the collection of such paper, stands in the attitude of an independent contractor who, having designated a sub-agent, is answerable to its customer for the neglect, failure or default of such agent. Under this rule the defendant bank is an independent contractor. It contracted to collect the paper itself and is responsible for the default of its agents in the same manner as though the acts of the agent had been performed by itself and under such rule it is not incumbent on plaintiff to show that defendant was negligent in selecting its agent."

In special concurring opinions, Chief Justice Wilson and Mr. Justice Stone severely criticized the rule relied upon in disposing of the case. The latter concluded his remarks by suggesting

[170 Minn. 20]: "Our error, if any, in following that case [the Malloy case] is on the side of conservatism, and one that can easily be corrected by the legislature if it desires that the law should be otherwise than we are now finding it to be." Shortly thereafter § 7233-1 was enacted.

In an opinion written some years after § 7233-1 became law (Bay State Milling Co. v. Hartford A. & I. Co. 193 Minn. 517, 259 N. W. 4, 5, 99 A. L. R. 507) this court explained the effect of the enactment when, speaking through Mr. Justice Loring, it said at p. 519:

"That statute changes the common law as it theretofore existed in this state in at least two respects. Before that time a collecting bank was regarded as an independent contractor responsible for the default of its agents, and it was not necessary to show that it had been negligent in selecting its agent, and such bank was responsible for accepting collections otherwise than in cash. * * * The legislature recognized that the usages and conditions of the banking business had changed and progressed to a point where our existing common law in this regard could not practically be applied in commerce. It therefore provided that a bank should not be liable for default or negligence on the part of a properly selected correspondent and that each correspondent should be liable only for its own negligence. Items received for collection, in the absence of contract, should be credited subject to final payment in cash or solvent credits, and a bank might send items directly or indirectly to any bank including the drawee or payor and accept as conditional payment in lieu of cash a draft, check, or credit."

These decisions have been set out in some detail because by understanding what the legislature intended to accomplish by the act we can more intelligently exclude from the coverage of the statute situations which the legislature did not intend to affect by this law. At the same time we recognize that it does not necessarily follow from the Bay State Milling Co. case [193 Minn. 517] that § 7233-1 was not intended to apply to cases of

the type now before us. We believe, however, that the language used by the legislature, while proper insofar as it sought to relieve depository banks from absolute liability for negligence of correspondents chosen by them and to permit the acceptance of credit by way of payment, is so inapt with respect to depositories upon which paper is drawn as to evince a legislative intent not to include such cases among those covered by the act.

The first sentence of § 7233-1 reads:

"Any bank, * * * doing business in this state, in receiving items for deposit or collection, in the absence of a written agreement to the contrary, shall act only as the depositor's collecting agent and shall have no responsibility beyond the exercise of due care."

. It appears highly unlikely that the legislature intended a bank upon which a check is drawn to be a "collecting agent" to collect from itself. The limitation upon the responsibility of the bank—that of exercising due care—seems to have been intended only to alter the absolute liability prescribed by the common law of this state. The next sentence of the statute reads: "All such items shall be credited subject to final payment in cash or solvent credit." Where a check drawn on a depository bank is presented to that bank for deposit to the payee's account and the drawer has on deposit in the bank sufficient funds to pay the check there is never a payment in cash. There is merely a transfer of credit from one account to another. The phrase "payment in * * * solvent credits" is apt insofar as the statute refers to checks drawn on third parties, but where the bank is the drawee the check is paid in solvent credits, by virtue of common-law decisions discussed above, when the bank credits the account of the depositor. The third and fourth sentences of the section obviously apply only to paper drawn on banks other than the depository. The last sentence of the section, which reads, "It may charge back any item at any time before final payment whether returned or not," seems to imply the forwarding of the check for payment—a practice which is not necessary where the depository

is the drawee. We conclude that § 7233-1 does not apply in the instant case.

Respondent bank argues that, apart from the statute, the agreement of the parties altered the common-law rule with respect to transfer of title to the check. The trial court found:

"11. * * * the deposit ticket, under which said check was delivered to said Bank & Trust Company, contained the following agreement: 'All items credited subject to payment. Items received for deposit or collection are credited subject to final payment in cash or solvent credits.' * * * The account of the plaintiff in said Bank & Trust Company was opened with defendant Bank & Trust Company on July 17, 1934, under an agreement providing in part as follows: 'In cashing or receiving and handling items for deposit or collection this Bank acts only as depositor's collection agent, and shall have no responsibility beyond the exercise of due care. All items are credited conditionally, subject to final payment in cash or solvent credits. * * * This Bank, or its correspondents, may send items, directly or indirectly, to any bank, including the payor, and accept its draft, check or credit as conditional payment in lieu of cash, it may charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank and later found to be not good.'"

What has been said of the language of the statute applies with equal force to the language of these provisions save for a phrase in the last sentence of the deposit account agreement to which reference will shortly be made. In both cases the language is apt insofar as it applies to paper which is not drawn on the depository—inapt with respect to paper which is. The meaning of similar language was considered in In re State Bank, 56 Minn. 119, 57 N. W. 336, 337, 45 A. S. R. 454, where this court was called upon to construe a passbook provision reading as follows [56 Minn. 124]:

"This bank, in receiving checks or drafts on deposit or for collection, acts only as your agent, and, beyond carefulness in select-

ing agents at other points and in forwarding to them, assumes no responsibility." Said the court: "What was intended by it [the statement] is best shown by the testimony of the ·cashier * * * of the bank. He says: 'The intention of it undoubtedly is this: that if we should have to send the draft for collection at Chicago or Oshkosh or wherever the case may be, and if the bank up there should send us paper that subsequently turned out to be no good, it would not fall on the State Bank [the depository], but on the party who has discounted or sold it."

The last sentence of the deposit account agreement, to repeat, provides:

"This bank, or its correspondents, may send items, directly or indirectly, to any bank, including the payor, and accept its draft, check or credit as conditional payment in lieu of cash, it may charge back any item at any time before final payment, whether returned or not, *also any item drawn on this Bank and later found to be not good.*" (Italics ours.)

The word "also" implies something additional. The inference to be drawn in this case is that the previous language of the sentence did not cover the case of items drawn on the depository bank. And with respect to such items, the bank reserved the right to charge back only when "later found to be not good." There is nothing in the findings of fact from which it can be inferred that the check in question was ever found to be not good. On the contrary, the trial court expressly found that defendant fruit company had on August 14 "a checking account in said Bank and Trust Company in which there was a sufficient balance to pay said $675.00 checks." We conclude that the agreement between plaintiff and the bank did not change the application of the common-law rule to the case before us. See Norton v. Mercantile B. & T. Co. (Tex. Civ. App.) 51 S. W. (2d) 1062.

Considerations of public policy have been advanced by both parties to this appeal. It is said that a bank will be subjected to onerous burdens if held irrevocably bound as debtor of a customer given credit in his passbook for the amount of checks drawn

on the bank. Whatever may be the situation with respect to checks drawn on accounts not having a sufficient balance to enable the bank to charge off the amount of the check credited by it to the account of the depositor, we see no reason why banks would suffer when, as here, the account of the drawer would not be overdrawn by payment of the check. By disregarding the stop order (as the bank should under this decision) the accounts could be balanced without harm to the depository.

On the other hand, the depositor would suffer in most cases by a contrary decision. In writing checks a depositor is accustomed to rely on the balance appearing in his passbook. Extreme embarrassment may be caused him if the bank is enabled to charge off sums credited to his account. The same can be said where the bank charges off the amount of a check which proves not to be good. But in such cases the hardship which the bank would suffer if held to have irrevocably credited the account of the depositor may outweigh the disadvantage a deduction causes the latter.

2. Having determined that the bank is liable to plaintiff, we need not consider the second phase of this case. Defendant bank is, absent considerations not appearing in the record, entitled to charge the amount of the check to defendant fruit company's account. The rights of the latter, if not settled amicably, can be adjudicated in a proper proceeding.

The judgment as against plaintiff in favor of defendant bank is reversed. The judgment as against plaintiff in favor of defendant fruit company is affirmed.