FRASER-SMITH COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18375.   Promulgated May 19, 1950.

*George Maloney, Esq.*, for the petitioner.
*Thomas A. Steele, Jr., Esq.*, for the respondent.

894

## OPINION.

HARRON, *Judge*: The chief issue in this proceeding is whether the credits of the face amounts of the drafts, which were accompanied by

bills of lading endorsed in blank, which were made to petitioner's account by the bank constituted "borrowed capital" as defined by section 719 (a) (1) of the Internal Revenue Code.[2]

In order to come within the provisions of section 719 (a) (1), the petitioner must establish that there was (1) *outstanding indebtedness*, which was (2) evidenced by "a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust." Respondent contends that petitioner has failed to satisfy either of these requirements. We agree with respondent that petitioner has failed to establish the first requisite. The method of receiving payment used by petitioner in grain transactions did not give rise to "outstanding indebtedness" within the meaning of that phrase, as it is used in section 719 (a) (1). In view of this holding, it will not be necessary to discuss whether or not the second requirement has been met.

The way the transactions were handled is set forth in the findings of fact, but, for convenience, it is restated here, as follows: At the time the petitioner shipped grain to a customer, it drew a sight draft, payable to the order of the bank, on the customer for either 90 per cent of the estimated price, or the full amount, depending upon whether the buyer or the petitioner—the seller—weighed the grain. The draft, an endorsed in blank bill of lading, and an ordinary deposit slip were delivered to the bank by the petitioner, and the bank credited petitioner's account for the face amount of the instrument. The bank then transmitted the draft and attached bill of lading to a correspondent bank at the purchaser's place of business. It was understood by all parties that the purchaser of the grain would make payment therefor by immediately honoring the sight draft drawn upon it when presented.

The bank charged petitioner's account at a later time with two items. One of the charges was measured by the length of time from the date the credit was made to the account to the date the instrument was paid by the drawee—the purchaser of grain. As far as the evidence in this proceeding shows, this lapse of time usually ranged from one to three days. The other charge was a collection charge.

Other aspects of the practice common to the grain trade of receiving payment for grain sold by using sight drafts drawn upon the purchaser and made payable to a bank should be referred to at the outset. The petitioner—the seller of grain—did not give any note to the bank in connection with the transaction. The bills of lading were endorsed

---

[2] SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *

in blank and were not returned to the petitioner. When a draft, with bill of lading attached, was delivered to the bank, it was handled as any deposit is handled, a deposit slip being made out by the petitioner and credit being made in the petitioner's account in the amount stated on the deposit slip. The credits established by the deposits were neither conditional nor restricted, and the petitioner had the right to draw immediately against the full amount of the "deposit" in the same manner as it could against cash deposits.

Expert witnesses testified that the practice of accountants in their treatment of drafts of the type involved herein is to show those items which are open at the end of the year as merely contingent liabilities on the part of the vendor of the grain. The drafts still open are not included in liabilities on the balance sheet, but are noted as contingent liabilities in a footnote to the balance sheet. The certified public accountants who prepared the audit statements and balance sheets of petitioner for the taxable years in question followed this practice.

There was also expert testimony that a person who deposits a draft, with a bill of lading attached, and receives immediate credit from a bank for the face amount of the draft is considered by the bank to be indirectly liable to it.

The respondent contends that no outstanding indebtedness to the bank on the part of the petitioner was created by the draft transactions, and that the bank purchased the drafts in a closed transaction in each instance. The petitioner contends that the credits which the bank made to its account when it deposited drafts constituted loans to petitioner by the bank, and that the bank, in effect, acted merely as its agent to collect the drafts. In the alternative, petitioner argues that, even if it were only contingently liable, as the drawer of the drafts, to the bank, which was the payee, such contingent liability is sufficient to qualify as borrowed capital within the intendment of section 719 (a) (1).

Decision of the issue presented requires a determination, first, of the question whether the bank, in the type of transaction involved, became the owner of the drafts delivered to it and for which it gave credits at once in the bank account of the petitioner. The bank either received the instruments as a purchaser or as an agent for collection. We think that this question must be considered in the light of the facts of this proceeding. We do not find any authority which is squarely in point, and this proceeding presents an unusual question under section 719 (a) (1) of the code. For the reasons hereinafter set forth, we arrive at the conclusion that there was transfer of ownership of the drafts to the bank and that the credits to petitioner's account with the bank upon delivery of instruments to it did not give rise to indebtedness to the bank, or loans from the bank to petitioner, and that, there-

fore, the credits did not constitute borrowed capital for the purpose of computing the amount of petitioner's borrowed invested capital.

Petitioner relies primarily on a provision contained in the agreement which the bank had with its corporation depositors and which it contends, precludes the conclusion that the bank purchased the drafts in question. The provision is, in part, as follows:

\* \* \* All items are credited conditionally, subject to final payments in cash or solvent credits. This Bank reserves the right to decline to honor checks, or other withdrawal orders, drawn against conditional credits. \* \* \*

It may charge back any item before final payment \* \* \*.

There is some support for petitioner's view. A few courts have held that the existence of the right to charge back items before final collection indicates that the bank takes the instruments deposited as an agent for collection only, and not as an owner. See *Denton* v. *Shenandoah Milling Co.*, 205 N. C. 77; 170 S. E. 107; *First National Bank* v. *Munding*, 83 Okla. 7; 200 Pac. 158. But the great weight of authority is to the contrary. In *City of Douglas* v. *Federal Reserve Bank of Dallas*, 271 U. S. 489, the Supreme Court held that, despite such a stipulation, the bank is a purchaser of the instruments *if the paper is endorsed unrestrictedly and at once passed to the depositor's credit*, since the stipulation merely authorizes the bank to charge back the amount of the credit in event of dishonor. In *City of Douglas* the facts were as follows: A depositor endorsed a check in blank and delivered it to the A bank. The depositor's account was credited with the amount of the check. The depositor's passbook, however, contained the statement "all out-of-town items credited subject to final payment." The check was sent to the B bank for collection, and, due to the negligence of this bank, the proceeds were not received. The A bank charged back the amount of the credit to the depositor. In an action by the depositor against the B bank, the Supreme Court held for the defendant on the ground that the A bank had become the owner of the check when it made the credit to the depositor's account, and, therefore, the depositor no longer possessed the relationship to the defendant necessary to bring suit. Speaking for the Court, Justice Stone said:

\* \* \* When paper is indorsed without restriction by a depositor, and is at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank; the bank becomes owner of the paper; and in making the collection is not the agent for the depositor. *Burton* v. *United States*, 196 U. S. 283; *Union Electric Steel Co.* v. *Imperial Bank*, 286 Fed. 857 \* \* \*.

Such was the relation here between the plaintiff and the Douglas Bank, unless it was altered by the words printed on the pass-book to the effect that out-of-town items were credited "subject to final payment." The meaning of this language, as the cashier of the Douglas Bank testified, and as the court below held, was that if the check was not paid on presentation, it was to be charged

back to plaintiff's account. The check was paid and the drawer and indorsers discharged. * * * Without these words the relationship between the plaintiff and the bank was that of indorser and indorsee; and their use here did not vary the legal rights and liabilities incident to that relationship, unless it dispensed with notice of dishonor to the depositor. * * *

While there is not entire uniformity of opinion, the weight of authority supports the view that upon the deposit of paper unrestrictedly indorsed, and credit of the amount to the depositor's account, the bank becomes the owner of the paper, notwithstanding a custom or agreement to charge the payment back to the depositor in the event of dishonor.

And in *Martin* v. *Huber*, 68 N. Y. Supp. (2d) 53, A drew a sight draft in the name of B, endorsed it in blank, and deposited the draft and the related bill of lading in his own account at the bank. The bank credited A with the full amount of the draft immediately upon deposit. The draft was not paid, and the question in the subsequent proceeding was whether or not title to the documents was acquired by the bank, which had the right to charge back the instrument. The court held that:

* * * When paper indorsed without restriction is deposited in a bank and the depositor's account is at once credited with the amount thereof, the depositor becomes a creditor of the bank; the bank becomes owner of the paper, and on making the collection is not the agent for the depositor, notwithstanding any right of the bank to charge back in the event of dishonor.

Under the earlier excess profits tax provisions, it was held that transactions involving the discount of promissory notes did not give rise to the borrowing or loaning of funds, but effected a sale of the notes. See *American National Bank of St. Paul*, 14 B. T. A. 476. In *Alworth-Washburn Co.*, 25 B. T. A. 140, we held that the discounting of notes constituted a sale and not a loan, so that taxable gain was realized. In affirming the decision of the Board of Tax Appeals, the Circuit Court relied upon *Elmer* v. *Commissioner*, 65 Fed. (2d) 568, 569, where Judge Learned Hand, speaking for the Circuit Court of Appeals for the Second Circuit, said:

If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default.

See *Alworth Washburn Co.* v. *Helvering*, 67 Fed. (2d) 694.

In the instant proceeding, we can not recognize any substantial difference between what the bank did upon receiving the drafts and bills of lading from the petitioner, i. e., crediting the face amount of the drafts to petitioner's account and making a small charge when the drafts were paid by the purchasers of grain, from discounting notes

or drafts where the discount is calculated on the time the items will require for collection. If the bank had known just how long it would take to collect the drafts, doubtless it would have discounted them. But, from the very nature of the transaction, it could not know the exact time which would elapse until the purchasers of grain would honor the drafts drawn upon them. Therefore, it made this small charge for the time intervening between the dates of credit and payment. This is entirely consistent with purchase of the drafts by a bank. See, e. g., *Vickers* v. *Machinery Warehouse & Sales Co.*, 111 Wash. 576; 191 Pac. 869.

Petitioner calls our attention to *Bay State Milling Co.* v. *Hartford Accident & Indemnity Co.*, 193 Minn. 517; 259 N. W. 4. That case interpreted Minnesota Statutes (1945), section 335.75, which has been incorporated largely verbatim by the bank in the provision with its depositors referred to previously. But the *Bay State Milling Co.* case merely held that the Minnesota statute was remedial in nature and expressly drawn to relieve banks of responsibility for the acts of their correspondents. See, also, *White Brokerage Co.* v. *Cooperman*, 207 Minn. 239; 290 N. W. 790. There is nothing inimical to the purchase concept in the fact that a bank may be the owner of a negotiable instrument and yet at the same time be held not to bear the risks incident to collection. In the law of sales, for example, there has been no insurmountable difficulty in the way of treating a buyer as "owner" and yet allowing a stipulation that the seller should bear the risk of loss in transit. Williston on Sales (Rev. Ed. 1948), sec. 302.

In view of all the facts in this case, it is concluded that the petitioner did not borrow funds from the bank, and that the bank was not petitioner's agent for the collection of the drafts, but, instead, that there was a transfer of ownership of the instruments from petitioner to the bank.

Petitioner argues, further, that even if it was only contingently liable as the drawer of the drafts to the bank which was the payee,[3] such contingent liability is sufficient to qualify as borrowed capital within the intendment of section 719(a)(1). But, for borrowed capital to be present under section 719(a)(1), there must be an "outstanding indebtedness." And this Court, as well as other courts, has held that a contingent liability does not constitute "outstanding indebtedness" as intended by this section. In *C. L. Downey Co.* v. *Commissioner*, 172 Fed. (2d) 810, affirming 10 T. C. 837, the court said that a contingent liability did not represent an "indebtedness" within the mean-

---

[3] The drawer of a draft or bill of exchange is secondarily liable to the holder thereof. His liability is contingent upon due presentment of the instrument for acceptance or payment and its subsequent dishonor. See Minnesota Statutes (1945), sec. 335.231, which is the same as section 61 of the Uniform Negotiable Instrument Law.

ing of section 719(a)(1). The court quoted with approval from *Gilman* v. *Commissioner*, 53 Fed. (2d) 47, 50, in which it was said:

The term "indebtedness" as used in the Revenue Act implies an unconditional obligation to pay. * * * While the sum of money may be payable upon a contingency, yet in such case it becomes a debt only when the contingency has happened, the term "debt" being opposed to "liability" when used in the sense of an inchoate or contingent debt.

See also *Player Realty Co.*, 9 T. C. 215.

The respondent's determination in excluding from borrowed capital the average amounts of the drafts delivered to the bank in the taxable years is sustained.

Reviewed by the Court.

*Decision will be entered for the respondent.*