The CITIZENS & PEOPLES NATIONAL BANK OF PENSACOLA, FLORIDA, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 76–2487.

United States Court of Appeals, Fifth Circuit.

April 7, 1978.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Act. Chief, Appellate Sect., Dept. of Justice, Washington, D. C., Paul D. Barker, Trial Atty., Michael L. Paup, Daniel F. Ross, Attys., Tax Div., Dept. of Justice, Washington, for defendant-appellant.

Daniel C. Perri, Joe J. Harrell, Pensacola, Fla., for plaintiff-appellee.

Before COLEMAN, HILL and RUBIN, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This appeal arises out of a priority dispute between the Internal Revenue Service (the Government) and the Citizens & Peoples National Bank of Pensacola, Florida (the Bank) over the proceeds of the general operating, checking account of Rosemont Nursing & Convalescent Home, Inc. (Rosemont).

The Government asserts priority to the proceeds of the account by virtue of a No-

tice of Levy served upon the Bank at 12:30 p. m. on May 20, 1975 to recover delinquent taxes assessed against Rosemont. The Bank at the time of service was in possession of two checks drawn on it by Rosemont in which the Bank was the payee. The Bank's claim is based on its contention that as of 11:00 a. m. on May 20, 1975, it had made a decision to pay the items and had taken action pursuant to that decision, thereby preempting the tax lien.

The matter came before the District Court on cross motions for summary judgment. The evidence consisted of documents, depositions, and affidavits. The District Court granted the Bank's motion for summary judgment, holding that, prior to service of the notice, the Bank had taken sufficient steps indicating its intention to pay the checks so that the claim of the Bank had priority over that of the Government.

The Government appeals. We reverse.

In this case, both parties agree that the second part of Section 4–303(1)(d) of the Uniform Commercial Code (UCC), as adopted by Florida, Florida Code Ann. § 674.4–303(1)(d), governs the disposition of the case.

Florida Code Ann. § 674.4–303(1) provides:

> Any knowledge, notice or stop-order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customers account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:
> (a) Accepted or certified the item;
> (b) Paid the item in cash;
> (c) Settled for the item without reserving the right to revoke the settlement and without having such right under statute, clearing house rule or agreement;
> (d) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith *or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item*; or
> (e) Become accountable for the amount of the item under § 674.4–213(1)(d) and § 674.4–302 dealing with the payor bank's responsibility for late return items. [Emphasis supplied].

To answer the question presented, critical attention must be given to the activities of the Bank prior to receipt and implementation of the Notice of Levy.

Rosemont Nursing and Convalescent Home, Inc. was a customer of the Bank. It maintained a general operating checking account and a payroll checking account with the Bank. Only the ownership of the funds in the general operating account is in dispute.

On March 31, 1975, the Bank loaned Rosemont the sum of $18,000.00. The loan was evidenced by the note of Abe Pierce, the President of Rosemont. On April 22, 1975, Rosemont made a payment of $6,000.00 on the note, leaving $12,000 plus accrued interest still owing.

On May 19, 1975, Rosemont delivered a check for $12,000 to Mrs. Carol Stewart, a teller in the Bank's commercial loan department. The check bore the notation, "Payoff on $18,000 note." Mrs. Stewart informed Rosemont that an additional sum of $238.89 was needed to cover the accrued interest on the loan. Rosemont agreed to deliver a check for the interest. Pending receipt of the interest check, Mrs. Stewart did not process, post or otherwise deal with the first check.

On May 20, 1975, at approximately 11:00 a. m., Rosemont delivered the check for the accrued interest to Mrs. Stewart. Mrs. Stewart testified that, when she received the interest check, she was engaged in balancing the totals for that morning's transactions. ". . . I received the interest check while we were trying to balance in the morning and I put it to one side to get

with Mr. Hall on it and I didn't want to put it through at that time or I would have had to have redone all that we had done, so I just put it to one side . . .."

Mrs. Stewart testified that she grouped the check for interest with the check for principal and the note. "All right, at that time I put it with the other check and the note and set it to one side to 'put through.' By 'put through,' I mean to actually stamp the note and put the checks in the drawer to go on through the bank."

Other than placing the checks with the note, Mrs. Stewart took no other actions prior to receiving notice of the levy. Likewise, there has been no suggestion made that Mrs. Stewart had knowledge that the Rosemont account contained sufficient funds to pay the items.

Mr. Oliver Hall, Jr., the Vice-President of the Bank, testified that he was familiar with the loan to Rosemont and that he had knowledge prior to May 20 that the Rosemont account contained sufficient funds to pay off the note. It further appears that Mr. Hall was aware that the check for the principal had been received on May 19. With respect to his knowledge of the receipt of the interest check, he testified ". . . I was not really aware of the time at which the interest check was received, but one of my tellers in the loan department that handled the transaction remembers the time." Mr. Hall further testified, ". . . I made the loan to Abe Pierce. He was my customer and I knew the circumstances, as well as the circumstances concerning the levy and the checks, and I don't think anyone else would have any better knowledge than I would, or as good a knowledge as I would of the entire transaction."

At approximately 12:30 p. m. on May 20, a mere hour and a half later than receipt of the second check, an Internal Revenue Service agent served the Bank with the Notice of Levy. The Bank immediately acted thereon, freezing the Rosemont account.

■ Under the terms of Section 4–303(1)(d), if the Bank had examined the Rosemont account and had taken action evidencing its decision to pay the items prior to service of the notice and a reasonable time to act thereon, its claim would be entitled to priority.

The District Court was of the opinion that the Bank had taken steps sufficient to gain priority over the competing claim. We disagree.

A review of the opinion of the District Court may serve to illuminate the errors committed by the Court.

The District Court framed the issue as follows:

The issue of law before the Court is whether the Plaintiff had in its possession property or rights to property of a depositor of the bank which were subject to levy as of 12:30 P.M. on May 20, 1975, with respect to two checks totalling $12,-238.89 which had been received by the Plaintiff prior to the levy and where the bank officials knew upon receipt of the two checks that funds sufficient to cover the two checks were in the depositor's account, but where the bank had not completed all of the bookkeeping entries to debit the account when it was served with the Notice of Levy.

■ It appears from reading the above passage that the District Judge combined the knowledge of Mr. Hall, that there were sufficient funds to pay the checks, with the action of Mrs. Stewart in placing the checks with the note. In so doing, the District Court erred.

Prior to implementation of the levy, there was no communication between Mr. Hall and Mrs. Stewart concerning the Rosemont account. Mr. Hall knew there were sufficient funds on hand. Mrs. Stewart did not. Mrs. Stewart received the second check and placed both checks with the note. Mr. Hall was unaware that the second check had been received. From these facts, we fail to perceive how the Bank can be said to have truly made a decision to pay the checks.

■ Furthermore, the District Court erred in holding that the mere act of grouping the checks with the note was action indicating the intention of the Bank to pay the items.

Florida has adopted the Official Comments to the Uniform Commercial Code. Comment 3 to Section 4–303 states as follows:

The sixth event conferring priority is stated by the language "or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item." This general 'omnibus' language is necessary to pick up other possible types of action impossible to specify particularly but where the bank [had] examined the account to see if there are sufficient funds and has taken some action indicating an intention to pay. An example is what has sometimes been called "sight posting" where the bookkeeper examines the account and makes a decision to pay but postpones posting. The clause should be interpreted in the light of *Nineteenth Ward Bank v. First Nat. Bank of South Weymouth*, 184 Mass. 49, 67 N.E. 670 (1903). It is not intended to refer to various preliminary acts in no way close to true decision of the bank to pay the item, such as receipt of the item over the counter for deposit, entry of a provisional credit in a pass-book, or the making of a provisional settlement for the item through the clearing house, by entries in accounts, remittance or otherwise. All actions of this type are provisional and none of them evidences the bank's decision to pay the item. In this Section as in Section 4–213 reasoning such as appears in *Cohen v. First Nat. Bank of Nogales*, 22 Ariz. 394, 400, 198 P. 122, 124, 15 A.L.R. 701 (1921); *Briviesca v. Colorado, [Coronado]*, 19 Cal.2d 244, 120 P.2d 649 (1941); *White Brokerage Co. v. Cooperman*, 207 Minn. 239, 290 N.W. 790 (1940); *Scotts Bluff County v. First Nat. Bank of Gering*, 115 Neb. 273, 212 N.W. 617, 618 (1927); *Provident Savings Bank & Trust Co. v. Hilderbrand, [Hildebrand]*, 49 Ohio App. 207, 196 N.E. 790, 791 (1934); *Schaer v. First Nat. Bank of Brenham*, 132 Tex. 499, 124 S.W.2d 108 (1939) (bill of exchange); *Union State Bank of Lancaster v. People's State Bank of Lancaster*, 192 Wis. 28, 33, 211 N.W. 931, 933 (1927); 1 Paton's Digest 1067, is rejected.

As the Comment states, the clause "is not intended to refer to various preliminary acts in no way close to a true decision of the bank to pay the item, such as receipt of the item over the counter for deposit, . . ."

In this case, the teller did not engage in "sight posting" or make any bookkeeping entries whatsoever. The only action capable of objective ascertainment was that the teller physically placed the checks with the note. We believe the Code requires more.

■ Mrs. Stewarts' testimony itself shows the ambiguous nature of the action. She at one point stated that she put the checks aside "to get with Mr. Hall on it." The thrust of that testimony, is that the decision to pay the items had not been made and that future consultation with Mr. Hall was necessary before such a decision could be made. Her testimony, on the other hand, that, because of convenience, she did not process the checks because she was balancing the morning transactions, is asserted as leading to the inference she had decided to pay the checks. However, this testimony leaves us at most with the assertion by the witness that she had subjectively formed an intention to pay the checks. An equally valid inference would be that the witness deliberately decided not to take the steps set out in § 674.4–303(1) at that time, and deliberately delayed doing so. That such a delay was determined upon merely for convenience does not compromise the effect of the delay, itself.

■ Section 4–303 specifies other banking events which may operate to make a Notice of Levy, stop order or the like untimely. A perusal of the statute reveals that, without exception, all of these events are unequivocal actions, capable of being objectively ascertained and providing the degree of certainty necessary to the orderly operation of the banking world.

In order to render certainty and predictability in the commercial world, the drafters of the Code found it necessary to engage in line drawing, which in certain instances may or may not comport with the

equities of a particular case. The drafters did, however, recognize the desirability of flexibility in certain situations. The portion of the statute at issue here is such an example.

■ Even though as the Comments indicate, subsection (d) was drafted to accommodate unforeseen bank practices, we are of the firm opinion that the drafters did not intend to give protection to the bank under these facts. Rather the drafters contemplated definite and objectively ascertainable actions similar to those expressly given·protection under 4–303(1).

In a similar context, Judge Lively in *Baker v. National City Bank of Cleveland*, 511 F.2d 1016 (6th Cir. 1975) has observed:

It would be unrealistic to hold that mere intra-mural declarations between employees of a bank, accompanied by no affirmative acts and no steps to record the transaction, are sufficient to effectuate a setoff. The business of banks is carried on, in the main, by making entries in records rather than by the transfer of money. It is a business of debits and credits. To permit a bank to effect a setoff against a customer's account by means of mere conversations among bank personnel would seriously undermine confidence in the banking system.

We agree with Judge Lively's comment. To uphold the claim of the Bank in this case would undermine the integrity of the banking process.

Among other reasons, the UCC was drafted to provide as much certainty as possible in the commercial world of banking. To give effect to the position advocated by the Bank in this case would result in much uncertainty and confusion in the application of Section 4–303. The Bank would be free to assert that it had or had not made a decision to pay an item depending upon its perceived interest. We hold that the actions taken with respect to the checks amounted to no more than acts preliminary to a true decision to pay the items.

*See* Florida Code Ann. § 674.4–213, comment 5.

There is a dearth of case law interpreting the portion of the statute we have addressed. Of all the cases we have examined, none grant protection on such ambiguous action by banks. *See Baker v. National City Bank of Cleveland*, 511 F.2d 1016 (6th Cir. 1975); *Yandell v. White City Amusement Park, Inc.*, 232 F.Supp. 582 (D.C.Mass. 1964). We refuse to make such an extension.

It therefore follows that the judgment of the District Court must be reversed and judgment entered in favor of the Government.

REVERSED.