**In re Harold Eugene JONES and Marvetta Marie Jones, Debtors.**

**Richard E. BARBER, not personally, but as Chapter 7 Trustee for Harold Eugene Jones and Marvetta Marie Jones, Plaintiff,**

**v.**

**REYNOLDS STATE BANK, Defendant.**

Bankruptcy No. 92–82782.
Adv. No. 93–8179.

United States Bankruptcy Court,
C.D. Illinois.

Dec. 28, 1993.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, IL, for plaintiff.

Dale G. Haake, Samuel S. McHard, Katz, McAndrews, Balch, Lefstein & Fieweger, P.C., Rock Island, IL, for defendant.

**OPINION**

WILLIAM V. ALTENBERGER, Chief Judge.

Before the Court are cross motions for summary judgment. A hearing was held on October 7, 1993. The matter was taken under advisement.

The Debtor, Harold Eugene Jones, a farmer and a feed dealer, had been a customer of the Defendant, REYNOLDS STATE BANK (BANK), for many years. The Debtor sold feed on open account to livestock producers. The BANK loaned the Debtor operating

funds for his feed business, Reynolds Feed Service. On July 20, 1992, the Debtor executed a note to the BANK in the principal amount of $30,000.00, due October 20, 1992. Though the Debtor granted the BANK a security interest in accounts receivable, the BANK failed to properly perfect by filing a Uniform Commercial Code UCC–1 with the Illinois Secretary of State.

On August 26, 1992, ninety-one days prior to the filing of the Debtors' Chapter 7 petition, the Debtor went to the BANK and tendered to Mr. Norman Wait, the BANK's President, a counter check[1] in the amount of $5,000.00, dated the following day, to apply on the loan. The BANK closed at noon on August 26, 1992, and the check was not recorded on the BANK's records until the following day.

Sometime prior to August 31, 1992, the BANK contacted certain of the Debtor's customers which had outstanding accounts receivable with the Debtor, offering to lend them the money to pay the Debtor. Several loans totaling $17,817.12 were made, joint checks were issued by the customers to the Debtor and the BANK, the checks were deposited in the Debtor's account at the BANK, and the BANK applied the sum of $17,922.17 to the Debtor's loan.

On November 25, 1992, the Debtor filed a Chapter 7 bankruptcy petition. Richard E. Barber, the Chapter 7 Trustee, brought this adversary proceeding seeking to recover $22,817.12 as preferential transfers. Both parties filed motions for summary judgment. The BANK's motion is accompanied by supporting affidavits.

The first issue to be determined is when did the transfer occur for purposes of § 547 with regard to the counter check tendered to the BANK's President on August 26, 1992. The BANK argues that the transfer occurred on the 91st day when the check was delivered because that is when the Debtor relinquished control of the check. The Trustee argues that the transfer did not occur until the check was paid on the 90th day, as shown on the books of the BANK. Both parties rely on the recent decision of the United States Supreme Court in *Barnhill v. Johnson*, —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). Holding that for purposes of § 547(b), a transfer made by check is deemed to occur on the date the check is honored, the court stated:

> A person with an account at a bank enjoys a claim against the bank for funds in an amount equal to the account balance. Under the U.C.C., a check is simply an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand. U.C.C. §§ 3–104(1), (2)(b), 2 U.L.A. 224 (1991). Receipt of a check does not, however, give the recipient a right against the bank. The recipient may present the check but, if the drawee bank refuses to honor it, the recipient has no recourse against the drawee. U.C.C. § 3–409(1), 2A U.L.A. 189 (1991).
>
> . . . .

Petitioner argues that the Court of Appeals erred in ignoring the interest that passed from the debtor to the petitioner when the check was delivered on a date outside the 90–day preference period. We disagree. We begin by noting that there can be no assertion that an unconditional transfer of the debtor's interest in property had occurred before [the 90th day prior to bankruptcy]. This is because as just noted above, receipt of a check gives the recipient no right in the funds held by the bank on the drawer's account. Myriad events can intervene between delivery and presentment of the check that would result in the check being dishonored. The drawer could choose to close the account. A third party could obtain a lien against the account by garnishment or other proceed-

---

1. The term "counter check" is not defined in the Uniform Commercial Code and has been applied to checks in a variety of forms. In this case the check is a negotiable instrument payable to the BANK, drawn on the BANK and signed by the Debtor. In that context it does not fall within the term as used by some courts to identify a check which is payable only to the drawer at the counter or to an order to withdraw funds in the drawer's account. Other courts have, however, used the term to mean a blank form check which the drawer fills in with his name and the name of the bank as well as the amount and payee. For purposes of this opinion, the Court will refer to the check as a counter check, as the parties have so characterized it.

ings. The bank might mistakenly refuse to honor the check.

[N]o transfer of any part of the debtor's claim against the bank occurred until the bank honored the check on November 20. The drawee bank honored the check by paying it. [U.C.C. § 1 201(21) (defining honor); U.C.C. § 4–213(a) ]. At that time, the bank had a right to "charge" the debtor's account, U.C.C. § 4–401,—i.e., the debtor's claim against the bank was reduced by the amount of the check—and petitioner no longer had a claim against the debtor. Honoring the check, in short, left the debtor in the position that it would have occupied if it had withdrawn cash from its account and handed it over to petitioner. We thus believe that when the debtor has directed the drawee bank to honor the check *and* the bank has done so, the debtor has implemented a "mode, direct or *indirect* . . . of disposing of property or an interest in property." 11 U.S.C. § 101(54) (emphasis added). For the purposes of payment by ordinary check, therefore, a "transfer" as defined by § 101(54) occurs on the date of honor, and not before.

The BANK contends that *Barnhill* supports its position. Contending that the focus of the court in *Barnhill* was that a transfer occurs when the debtor parts with control over the property, the BANK argues that because the check was made payable to the BANK the Debtor lost control over the check when he handed it to the BANK's President. The BANK postures that had the Debtor asked for the check back prior to the BANK posting it on its records, the BANK could have rightly refused. This Court disagrees.

Section 4–213(1)(a) of the Uniform Commercial Code determines when "final payment" of an item has been made by a payor bank. That section provides, in part:

An item is finally paid by a payor bank when the bank has first done any of the following:

(1) paid the item in cash;

(2) settled for the item without having a right to revoke the settlement under statute, clearing-house rule, or agreement; or

(3) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule, or agreement.

810 ILCS 5/4–215(a).[2] Under § 4–213(a), the time of settlement by a bank is

with respect to tender of settlement by a credit or debit to an account in a bank, when the credit or debit is made or, in the case of tender of settlement by authority to charge an account, when the authority is sent or delivered.

810 ILCS 5/4–213(a)(2)(iii). The term "settle" is defined by the Code to mean

[T]o pay in cash, by clearing-house settlement, in a charge or credit or by remittance, or otherwise as agreed. A settlement may be either provisional or final.

810 ILCS 5/4–104(11).

The UCC Code Comments to this provision discuss the import of the term:

The term "settle" has substantial importance throughout Article 4. In the American Bankers Association Bank Collection Code, in deferred posting statutes, in Federal Reserve regulations and operating circulars, in clearing-house rules, in agreements between banks and customers and in legends on deposit tickets and collection letters, there is repeated reference to "conditional" or "provisional" credits or payments. Tied in with this concept of credits or payments being in some way tentative, has been a related but somewhat different problem as to when an item is "paid" or "finally paid" either to determine the relative priority of the item as against attachments, stop-payment orders and the like or in insolvency situations. There has been

---

**2.** The "process of posting" test, formerly a part of § 4–213(1)(c), which provided that final payment occurred when the payor bank completed the process of posting, has been abandoned. *See* Code Comment, § 810 ILCS 5/4–215. That term was defined in former § 4–109. Courts had concluded that the provision was unworkable and ill-suited for the automated system of check collection and presentment. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank*, 832 F.2d 1005 (7th Cir.1987).

extensive litigation in the various states on these problems. To a substantial extent the confusion, the litigation and even the resulting court decisions fail to take into account that in the collection process some debits or credits are provisional or tentative and others are final and that very many debits or credits are provisional or tentative for awhile but later become final. Similarly, some cases fail to recognize that within a single bank, particularly a payor bank, each item goes through a series of processes and that in a payor bank most of these processes are preliminary to the basic act of payment of "final payment."

The term "settle" is used as a convenient term to characterize a broad variety of conditional, provisional, tentative and also final payments of items. Such a comprehensive term is needed because it is frequently difficult or unnecessary to determine whether a particular action is tentative or final or when a particular credit shifts from the tentative class to the final class. Therefore, its use throughout the Article indicates that in that particular context it is unnecessary or unwise to determine whether the debit or credit or the payment is tentative or final. However, if qualified by the adjective "provisional" its tentative nature is intended, and if qualified by the adjective "final" its permanent nature is intended.

Examples of the various types of settlement contemplated by the term include payments in cash; the efficient but somewhat complicated process of payment through the adjustment and offsetting of balances through clearing houses; debit or credit entries in accounts between banks; the forwarding of various types of remittance instruments, sometimes to cover an entire group of items received on a particular day.

In *Del State Bank v. Patton,* 513 P.2d 868, 12 U.C.C.Rep.Serv. 1167 (Okla.S.Ct.1973), a case involving similar facts, corporate officers had delivered a corporate check payable to the bank on which the check was drawn and left it with a bank officer with directions to apply it on a note of the corporation held by the drawee bank. Later on that same day, the corporate officers instructed the bank officer to hold up the payment on the note in order that they could make certain tax payments. The court held that because the check had not been acted upon, the bank was required to honor the stop-payment order.

In *Citizens & Peoples National Bank of Pensacola v. United States,* 570 F.2d 1279 (5th Cir.1978), 23 U.C.C.Rep.Serv. 984, a customer delivered a check to the bank's teller in payment of a note held by the bank. The customer was advised that additional monies were necessary to pay accrued interest on the note and agreed to return with a check for the interest. The teller held the first check pending receipt of the second. When the customer returned the next day with the second check, the teller was engaged in other work and set the check aside along with the first check and the note. Less than two hours later and prior to taking any other actions, a notice of levy was received from the IRS. The version of the U.C.C. then in effect provided that a notice of garnishment comes too late if it is served after the bank had "otherwise . . . evidenced by examination of such indicated account and by action its decision to pay the item." Holding that the teller's actions were insufficient to evidence a decision by the bank to pay the item, and that the IRS's levy had priority over the bank's claim based on the check, the court reasoned:

Section 4–303 specifies other banking events which may operate to make a Notice of Levy, stop order or the like untimely. A perusal of the statute reveals that, without exception, all of these events are unequivocal actions, capable of being objectively ascertained and providing the degree of certainty necessary to the orderly operation of the banking world.

In order to render certainty and predictability in the commercial world, the drafters of the Code found it necessary to engage in line drawing, which in certain instances may or may not comport with the equities of a particular case. The drafters did, however, recognize the desirability of flexibility in certain situations. The portion of the statute at issue here is such an example.

. . . .

In a similar context, Judge Lively in *Baker v. National City Bank of Cleveland,* 511 F.2d 1016 [16 UCC Rep 298] (6th Cir.1975) has observed:

"It would be unrealistic to hold that mere intra-mural declarations between employees of a bank, accompanied by no affirmative acts and no steps to record the transaction, are sufficient to effectuate a setoff. The business of banks is carried on, in the main, by making entries in records rather than by the transfer of money. It is a business of debits and credits. To permit a bank to effect a setoff against a customer's account by means of mere conversations among bank personnel would seriously undermine confidence in the banking system."

We agree with Judge Lively's comment. To uphold the claim of the Bank in this case would undermine the integrity of the banking process.

Finally, it is important to note that the counter check was prepared and postdated to August 27, 1992, by the BANK's President. A postdated check is technically not payable before its date. Bailey & Hagedorn, *Brady on Bank Checks,* ¶ 2.10 (7th ed. 1992). *See also* § 3–113(a) of the UCC which provides in part:

An instrument may be antedated or postdated. The date stated determines the time of payment if the instrument is payable at a fixed period after date.

■ In the present case there is no dispute that no action was taken with respect to the check given by the Debtor to the BANK on August 26, 1992. The BANK had taken no steps which would constitute final payment under § 4–215(a). The check by its own terms was not payable until August 27, 1992. While the BANK held the check the Debtor could have stopped its payment or an IRS levy could have intervened and obtained

priority. Under *Barnhill v. Johnson,* the transfer did not occur before August 27, 1992, and therefore falls within the 90–day preference period.

■ The next issue involves the payments received by the Debtor from his customers as a result of loans made to the customers by the BANK. According to the affidavit of the BANK's President, at some point prior to August 20, 1992, the Debtor and the BANK agreed that the BANK would collect certain accounts receivable and apply the funds to the Debtor's note. The BANK contacted four of the Debtor's customers who agreed to borrow the funds from the BANK and issue a joint check in payment of their accounts with the Debtor to the Debtor and the BANK.[3] On August 28, 1992, Carl Anderson issued a check to the Debtor and the BANK for $7,353.40. The following checks were received on August 31, 1992, and made payable to the Debtor and the BANK: Thomas Conway, $8,123.99; David Lloyd, $1,950.36; and Ronnie Ziemer, $494.42. Conway's and Anderson's accounts were paid in full whereas balances remained due on both Lloyd's and Ziemer's accounts. The checks, totaling $17,922.17 were deposited in the Debtor's account and the Debtor drew a check to the BANK in the amount of $17,817.12. All of the amounts paid to the Debtor were due and owing as of August 26, 1992.

The BANK characterizes this arrangement as a classic example of the earmarking doctrine. The Seventh Circuit Court of Appeals recently discussed the doctrine in *Matter of Smith,* 966 F.2d 1527 (7th Cir.1992):

[The "earmarking"] doctrine is applicable only where a third party lends money to the debtor *for the specific purpose of paying a selected creditor. See, e.g., [In re] Bohlen Enterprises,* 859 F.2d [561] at 566. In such circumstances the payment is "earmarked" and the third party simply substitutes itself for the original creditor. Such a transfer is said not to be a preferential

---

3. From the evidence introduced at the hearing, the Trustee presumed that certain of the notes had since been paid off. After the hearing, the BANK filed an addendum to its motion for summary judgment, attaching an affidavit of the BANK's President, stating that the notes executed by Conway and Anderson were paid by renewal, rather than having been paid off as the Trustee suggested. The Trustee moved to strike the BANK's addendum. This Court will deny the Trustee's motion to strike, even though it finds that the facts alleged in the affidavit are not determinative.

transfer because (1) the debtor never exercises "control" over the new funds; and (2) the debtor's property (i.e., the fund out of which creditors can be paid) is not diminished.

After noting every earmarking case involves three players—the "old" creditor, the "new" creditor and the debtor, the court in *In re Grabill Corp.*, 135 B.R. 101 (Bkrtcy.N.D.Ill. 1991), concluded that application of the earmarking doctrine involves four essential elements:

> (1) existence of an agreement between the debtor and the new creditor for repayment of an antecedent debt; (2) the performance of this agreement by which the old creditor receives the agreed consideration; (3) the debtor's lack of dispositive control over the transferred property; and (4) the transfer's impact on the estate, namely whether the transfer depleted the debtor's estate.

The BANK relies heavily on *In re Network 90, Inc.*, 126 B.R. 990 (N.D.Ill.1991). In that case, the debtor, a dealer in office furnishings and equipment, entered into an agreement with the defendant, a furniture manufacturer, whereby the debtor's customers would issue joint checks to the debtor and the manufacturer and the manufacturer would apply the major portion of the payment to the amount due it from the debtor, remitting approximately 22% to the debtor. After falling further behind with the defendant, the debtor agreed to grant the defendant a power of attorney to endorse all checks and to forward all checks received to the defendant to apply the full proceeds to its obligations. The debtor filed bankruptcy and sought to recover the monies received by the defendant during the preceding 90–day period as preferential transfers. In an expanded application of the earmarking doctrine, the district court held for the defendant:

> The Trustee is correct in contending that the circumstances which normally call for invocation of the earmarking doctrine are missing from this case. Here, in contrast to the traditional earmarking case, there is no third party which loaned funds to Network 90 for the purpose of reducing Network 90's debt to SunarHauserman.

Instead, the payments transferred to SunarHauserman were made by Network 90's customers. Thus, this case does not reflect the usual scenario underlying the earmarking doctrine, substitution of one creditor for another. The customers of Network 90 did not become new creditors of the company (although, as the Bankruptcy Court recognized, Network 90 was obligated to provide products to the customers in exchange for the payments received). Moreover, although these customers evidently were instructed to make their checks payable jointly to Network 90 and SunarHauserman and likely realized as a result that the payments might be handed over to SunarHauserman, presumably the customers had no concern over who actually cashed the checks and retained the funds.

Nonetheless, the Bankruptcy Court was correct in concluding that the earmarking doctrine does not necessarily require that there be a new creditor which supplies money to pay off a debt to an existing creditor. The foundation of the earmarking doctrine lies not in the relationship of the old and new creditors and the debtor, but in the debtor's control (or lack of control) over the assets which were transferred.

The district court emphasized that Network 90 never had any control over the payments made by its customers and that the agreement between Network 90 and SunerHauserman was entered into well before the preference period began.

The district court in *Network 90, Inc.*, noted that its decision was contrary to that reached by the court in *In re Buono*, 119 B.R. 498 (Bkrtcy.W.D.Pa.1990). In that case the agreement entered into between the debtor and the creditor that payments due the debtor requiring joint payments was entered into during the preference period. The court characterized the case as a "textbook example of a bankruptcy preference" and entered judgment for the trustee.

The terms of the agreement between the Debtor and the BANK in the present case have not been clearly established. In his affidavit, the BANK's President states that

"sometime prior to August 20, 1992" the Debtor agreed that the BANK would collect "certain" accounts receivable and apply the funds to the Debtor's note. According to the affidavits of the Debtor's customers, the BANK's President contacted them "some time in July or August, 1992." Yet the Trustee introduced into the record a letter from the BANK's President to the Debtor dated August 20, 1992, which states that the BANK "hope[s] that the accounts receivable will be paid *to you* in such a manner that you can get the balance of this note retired by the due date." (Emphasis added.) Rather than reflecting any agreement between the BANK and the Debtor, the letter closes by expressing the BANK's appreciation for the Debtor's understanding of the BANK's position.

To permit the BANK to invoke the earmarking doctrine on the status of the record before this Court violates the core of the preference provision—to preserve the property includable within the bankruptcy estate and to promote equality of distribution. This Court need not decide whether it would follow the *Network 90* decision because it finds that the BANK has failed to establish that the Debtor relinquished all control over the accounts receivable prior to the beginning of the preference period. It is not clear that the BANK and the Debtor agreed that the BANK would collect only certain specified accounts. Any collection of an account by the BANK required the consent of the particular account debtor. Moreover, the joint checks were deposited in the Debtor's account. Allowing these transactions to stand would encourage a lender, who is astute enough and quick enough to cherry-pick its creditor's debtors, thereby looting the debtor's estate on the eve of bankruptcy. In contrast to the classic earmarking doctrine where a new creditor of the debtor is substituted for an old creditor, what happened here is that the BANK substituted a chosen debtor for one that it perceived to be in bad shape. Contrary to the BANK's assertions,

those are not the facts of the *Network 90* case.

The BANK also contends that it had the right to setoff the funds in the Debtor's account. Even assuming that the BANK was entitled to setoff under § 553 of the Bankruptcy Code, this defense must also fail.[4] The funds deposited by the Debtor and purportedly "setoff" by the BANK were, according to the BANK's own affidavits, procured solely through the efforts of the BANK. Having done so, the BANK is not entitled to setoff the funds:

> Ordinarily no voidable preference is created when a bank sets off funds in a general deposit account against a debt owed to the bank by the depositor. The bank's setoff exception, however, applies only to deposits made in good faith, made in the due course of business, and subject to withdrawal at the will of the depositor. More importantly to the instant case, "The setoff exception does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor. (Citations omitted.)

*Matter of PRS Products, Inc.,* 574 F.2d 414 (8th Cir.1978).

The Trustee seeks prejudgment interest from May 24, 1993, the date of the filing of the complaint, at the prime rate as dictated by the Seventh Circuit Court of Appeals in *Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279 (7th Cir.1992), and *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431 (7th Cir.1989). Accordingly, the Trustee will be entitled to interest at the rate of 6%.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

**ORDER**

For the reasons set forth in the Opinion entered this day, IT IS HEREBY ORDERED:

---

**4.** Section 553 of the Bankruptcy Code governing setoff does not create any new right of setoff but merely preserves the common-law or statutory rights under applicable nonbankruptcy law. *In re Pieri,* 86 B.R. 208 (9th Cir. BAP 1988); 4 *Collier on Bankruptcy,* ¶ 553.02 at 553–10 (15th ed.1987).

1. The Trustee's Motion to Strike the Addendum to Motion for Summary Judgment filed by the BANK is DENIED.

2. The Motion for Summary Judgment filed by the Trustee is hereby GRANTED and judgment is entered in favor of the Trustee, and against the BANK, in the amount of $22,817.12 plus interest at the rate of 6% from May 24, 1993, through the date of this Order, plus costs.

3. The Motion for Summary Judgment filed by the BANK is hereby DENIED.